UNITED STATES of America

v.

Victor GERENA, et al.

Crim. No. H–85–50 (TEC).

United States District Court,
D. Connecticut.

Nov. 16, 1987.

Albert S. Dabrowski, Carmen E. Van Kirk, John A. Danaher, III, Leonard C. Boyle, Asst. U.S. Attys., Stanley A. Twardy, Jr., U.S. Atty., Hartford, Conn., David D. Buvinger and William J. Corcoran, Trial Attys., U.S. Dept. of Justice, Washington, D.C., for U.S.

Leonard I. Weinglass, New York City, for Juan E. Segarra–Palmer.

William M. Kunstler and Richard J. Harvey, New York City, for Filiberto Ojeda Rios.

Jacob Wieselman, Hartford, Conn., for Luz Berrios–Berrios.

Harold Meyerson, New York City, for Jorge Farinacci–Garcia.

Juan R. Acevedo, Hartford, Conn., for Norman Ramirez Talavera.

James L. Sultan, Rankin & Sultan, Boston, Mass., for Ivonne Melendez Carrion.

Diane Polan, New Haven, Conn., for Elias Castro Ramos.

James Bergenn, Shipman & Goodwin, Hartford, Conn., for Carlos Ayes–Suarez.

Richard Reeve, Asst. Federal Public Defender, New Haven, Conn., for Isaac Camacho–Negron.

Linda Backiel, Philadelphia, Pa., for Antonio Camacho Negron.

Margaret P. Levy, Hartford, Conn., for Angel Diaz Ruiz.

Michael Deutsch, Chicago, Ill., for Orlando Gonzalez Claudio.

John Williams, New Haven, Conn., for Hilton Fernandez–Diamante.

Ronald L. Kuby, New York City, for Luis Colon Osorio.

Robert J. Maldonado–Rivera, Rio Piedras, P.R., pro se.

F. Mac Buckley, Buckley & Santos, Hartford, Conn., for Paul Weinberg.

## MEMORANDUM OF DECISION ON CHALLENGE TO JURY SELECTION SYSTEM

CLARIE, District Judge.

The defendant, Jorge A. Farinacci–Garcia, on behalf of all defendants in this action, has moved to dismiss the indictment and stay the proceedings because the jury selection system presently utilized in two divisions of the District of Connecticut violates the Jury Selection and Service Act of 1968, 28 U.S.C. Sec. 1861 *et seq.*, and the Fifth and Sixth Amendments to the United States Constitution. The gravamen of his complaint is that Hispanics and Puerto Ricans are underrepresented in the federal court on District of Connecticut grand and petit jury venires. He asks the Court to dismiss the superseding indictment handed down in the New Haven Division of the Court and to stay the proceedings presently in progress in the Hartford Division. For the reasons set forth below, the defendant's motion to dismiss the indictment and stay said proceedings is DENIED.

## I. BACKGROUND

### A.

On March 21, 1986, a federal grand jury in the New Haven Division of the Court filed a superseding indictment, which charged Farinacci and fifteen of his original co-defendants with the same crimes as those set out in the prior indictment together with several additional offenses and included three additional defendants.

On November 8, 1985, defendant Farinacci–Garcia, on behalf of all the defendants, moved to dismiss the original indictment and stay these proceedings pursuant to 28 U.S.C. Sec. 1861, *et seq.* He also moved for discovery concerning jury selection procedures in the New Haven and Hartford Divisions pursuant to 28 U.S.C. Sec. 1867(f). The Court granted the defendant's motion for discovery, thus giving him the opportunity to assemble and present such evidence which would tend to demonstrate that the jury selection system utilized in this District resulted in under-representation of Hispanics and Puerto Ricans in violation of relevant constitutional and statutory provisions.

On January 9, 1987, the defendant moved for an evidentiary hearing on the still pending motion to dismiss the indictment and stay the proceedings. In support of said motion, the defendant initially relied upon the affidavit of Harvard University Professor Richard Levins. Prior to the hearing scheduled on his motion, however, the defendant conceded that the Levins affidavit did not set forth facts which would demonstrate a prima facie case of illegal underrepresentation on New Haven and Hartford Division juries. Accordingly, he requested a continuance to assemble corrected data. He now presents a new report by Dr. Alan E. Gelfand, a statistician from the University of Connecticut, which he claims demonstrates a prima facie case of unconstitutional discrimination with respect to the selection of petit and grand juries in the New Haven and Hartford Divisions of the United States District Court for the District of Connecticut.

On July 16, 1987, the Court held a hearing on the defendant's challenge. *See* Transcript of Proceedings for July 16, 1987 (filed July 22, 1987) (hereinafter referred to as "Transcript"). Prior to the defendant's actual presentation of testimony in support of his motion, the Government argued that the defendant's submissions did not demonstrate a prima facie case which would entitle him to an evidentiary hearing. Nevertheless, the Court allowed both parties to present testimony and evidence, with the express understanding that it would reserve its decision on the issue of whether the defendant had demonstrated a prima facie case which would, in fact, entitle him to a full evidentiary hearing. As discussed *infra*, the Court now finds that the defendant has not met his burden of presenting facts which, if accepted as true, demonstrate a prima facie case of impermissible discrimination or underrepresentation of Hispanics and Puerto Ricans on New Haven and Hartford Division grand and petit juries.

### B.

According to the Jury Selection and Service Act of 1968,

> [i]t is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes. It is further the policy of the United States that all citizens shall have the opportunity to be considered for service on grand and petit juries in the district courts of the United States, and shall have an obligation to serve as jurors when summoned for that purpose.

28 U.S.C. Sec. 1861. To promote this policy, the judges of the District of Connecticut adopted the "Plan for Random Selection of Grand and Petit Jurors" (hereinafter referred to as the "Plan"). The Plan was originally adopted on June 21, 1968 and approved by the Reviewing Panel of the United States Court of Appeals for the Second Circuit on September 23, 1968. *See* Government's Response in Opposition to Motion to Dismiss the Indictment (filed April 14, 1987) (incorporating the Plan as Exhibit B). Since 1968, the selection of grand and petit jurors in the District of Connecticut has been governed by this Plan. Subsequent amendments to the Plan have not materially altered its essential features. *United States v. Ayala*, Criminal No. H–84–16, Ruling on Defendant's Motion to Quash the Indictment, slip op. at 2 (D.Conn. December 7, 1984) (Blumenfeld, J.).

Under the Plan, the District of Connecticut is divided into three geographic divisions, Hartford, New Haven and Bridgeport, for the purpose of jury selection. The Hartford Division consists of Hartford, Litchfield, Windham, and Tolland Counties. The New Haven Division consists of New Haven, New London, and Middlesex Counties. The only county in the Bridgeport Division is Fairfield County.

Title 28 U.S.C. Sec. 1863(b)(2) provides that any jury selection plan must "specify whether the names of prospective jurors shall be selected from the voter registration lists" and "shall prescribe some other source or sources of names in addition to voter lists where necessary to foster the policy and protect the rights secured by sections of 1861 and 1862 of this title." When adopting the Plan, the Court found that "voter registration lists represent a fair cross-section of the populace of the District of Connecticut, and that it is not necessary to prescribe any other source or sources of names of prospective jurors...." Plan at sec. VI.

In each Division, potential jurors are selected at random. The random selection procedure is accomplished by selecting substantially one per cent of the names appearing on voter registration lists. To begin the selection, a starting number from 1 to 100 is drawn by lot in open court and that name is selected from each voter registration list. Thereafter, each 100th name is draw. Thus, if the starting number drawn is 8, the 8th, 108th, 208th, etc. names are picked from each voter registration list.

The selected names are then placed in the Master Jury Wheel. The Master Jury Wheel is compiled every four years; the current Master Jury Wheels for all three divisions were compiled in 1985. *See* Transcript at 157; Plan at sec. X. Names are randomly drawn from the Master Wheel as needed, before establishing eligibility for the Qualified Jury Wheel. Each person whose name is drawn is sent a juror qualification questionnaire. The information provided on the questionnaire allows the Chief Judge or his designee to determine whether the prospective jurors are qualified for jury service. The names of all qualified prospective jurors are then placed in the Qualified Jury Wheel. Thereafter, grand jury panels and petit jury venires are selected at random from the names in the Qualified Jury Wheel. *See United States v. Ayala,* slip op. at 3.

### C.

In support of his claim, the defendant presents statistical evidence compiled by his expert, Dr. Alan Gelfand. The Government has conceded that Dr. Gelfand's figures are in substantial agreement with the figures provided by its own expert, Dr. Timothy Wyant. *See* Transcript at 123; Defendant's Memorandum in Support of Motion Challenging the Jury Selection System (filed July 29, 1987) at 2, n. 2; Government's Supplemental Response in Opposition to Defendants' Jury Selection Challenge (filed July 30, 1987) at 6. For the purpose of evaluating the merits of the instant challenge, the Court will only consider the statistics proffered by the defendant.[1]

In the District of Connecticut, individuals who are placed in the Master Jury Wheel, and ultimately in the Qualified Jury Wheel, are selected at random from voter registration lists. Dr. Gelfand testified that this sole reliance on voter registration lists is the primary problem with the jury system in this District. Transcript at 42. According to Dr. Gelfand, reliance on voter lists will inevitably result in the underrepresentation of Hispanics and Puerto Ricans in the New Haven and Hartford Divisions, because many members of these groups do not register to vote.

In making his computations, Dr. Gelfand obtained his population figures from the 1980 United States Census Bureau Census Report. According to the United States Census Bureau, the total number of individuals who were 18 years old or older, and thus eligible for jury service, (hereinafter referred to as "age-eligible" individuals) in the Hartford Division was 862,344. Of this number, 25,095 were of Hispanic origin. In the New Haven District, the number of age-eligible individuals was 832,694. Of this number, 19,516 were of Hispanic ori-

1.

| | Absolute Difference Adj. For Undercount (Puerto Ricans) | Absolute Impact On Jury Composition | Relative Difference Adj. For Undercount (Puerto Ricans) | Absolute Difference Adj. For Undercount and Population Change Since 1980 (Puerto Ricans) | Absolute Impact On Jury Composition | Relative Difference Adj. For Undercount and Population Change Since 1980 (Puerto Ricans) | Significant Test, Std. D P Value (Spanish Origin) |
|---|---|---|---|---|---|---|---|
| Hartford M1981 | 2.23–1.27=.96% | V=.58 P=.22 | 43.0% | 1.03% | P=.62 V=.24 | 44.8% | –5.45, 10–4 |
| Hartford Q1983 | 2.23–1.00=1.23% | V=.74 P=.28 | 55.2% | 1.43% | P=.86 V=.33 | 58.8% | –3.73, 10–4 |
| Hartford M1984 | 2.23–1.56=.77% | V=.46 P=.18 | 34.5% | 1.04% | P=.62 V=.24 | 41.6% | –3.63, 10–4 |
| Hartford Q1987 | 2.23–.62=1.61% | V=.97 P=.37 | 72.2% | 2.08% | P=1.25 V=.48 | 77.0% | –4.06, 10–4 |
| New Haven M1984 | 1.63–1.39=.24% | V=.14 P=.06 | 14.7% | .43% | P=.26 V=.10 | 25.6% | –1.39, .08 |
| New Haven Q1986 | 1.63–1.10=.53% | V=.32 P=.12 | 32.5% | .82% | P=.49 V=.19 | 42.7 | –1.01, .15 |

In this chart, P= the number of Puerto Ricans needed to correct underrepresentation on a 60 person petit jury venire, while V= the number of Puerto Ricans needed to correct underrepresentation on a 23 person grand jury panel.

gin. Dr. Gelfand identified these Hispanic individuals by matching the last names of the total age-eligible population with the names on the United States Census Bureau Spanish surname list. *See* Dr. Gelfand's Statistical Analysis of Hartford and New Haven, (hereinafter referred to as "Gelfand Report") at Table 2. The Government's expert, Dr. Timothy Wyant, agreed that cross-checking the names in the age-eligible population with the names on the Spanish surname list is an accepted method of identifying individuals of Hispanic origin. *See* Transcript at 135. Dr. Gelfand further identified those Hispanic individuals of Puerto Rican origin by using figures supplied in a report entitled 1980 Census of Population, General Population Characteristics, Connecticut. Gelfand Report at 1.

Dr. Gelfand then modified this data, as it relates to the age-eligible Hispanic and Puerto Rican populations, in two ways. At the outset, the Court notes that, though Dr. Gelfand's figures have been accepted for the purpose of considering the defendant's motion, some of these modifications seem to have been made by using statistics with questionable relevance to the instant challenge. A defendant is entitled to a jury which is selected from a fair cross section of the community wherein the court convenes. By contrast, some of Dr. Gelfand's figures are arbitrarily adjusted by using national, rather than local, figures. Dr. Gelfand first increased his figures by 6%, to reflect the generally held view that the Census undercounts minorities and poor people and overcounts the white population. However, in determining that this 6% adjustment was appropriate, he simply assumed that the Puerto Rican undercount is comparable to that of Blacks, 4.8%. Thus, his undercount/overcount adjustment reflects national trends and not necessarily trends which are accurately applied to the New Haven and Hartford Divisions.

In a second set of computations, Dr. Gelfand adjusted his figures upward to account for an assumed increase in the Hispanic population in the District of Connecticut between 1980 and 1987. Using Census Bureau figures, Dr. Gelfand determined that, at a national level, the overall population of the United States increased by 11.7% from 1960 to 1970 and by 11.5% from 1970 to 1980. He further found that individuals of Spanish origin increased by 81.0% from 1960 to 1970 and by 61.0% from 1970 to 1980. He determined that individuals of Puerto Rican origin increased by 55.9% from 1960 to 1970 and by 40.9% from 1970 to 1980. Dr. Gelfand then translated this into a 20 year total increase of 45.6% for Hispanic age-eligible individuals, and 29.8% for Puerto Rican age-eligible individuals. He finally assumed that the increase of age-eligible individuals of Hispanic and Puerto Rican origin during the years 1980 to 1987 could be assumed to be seven tenths of the percentage of the increase of these groups during 1960–1980 and adjusted his figures accordingly. Gelfand Report at 2–3. However, this adjustment is misleading. Not only are these figures based upon an assumption that current national growth in the age-eligible population of Hispanics and Puerto Ricans mirrors past national population growth, but they are also based upon an assumption that the national growth of the Hispanic and Puerto Rican populations mirrors the growth of these groups in the New Haven and Hartford Divisions.

### D.

Dr. Gelfand's conclusions for the most part relate to the age-eligible Puerto Rican population and are graphically summarized in the chart set forth in footnote 2 (hereinafter referred to as "Gelfand Chart"). The permutations presented in the Chart represent various methods which courts have used to determine the legal significance of the relationship between statistically demonstrable discrepancies in the total number of age-eligible individuals in a distinct group and the frequency of the group's representation on grand and petit jury venires. Four basic methods of statistical analysis are used in challenges to jury venires: the absolute difference standard, the relative difference standard, statistical decision theory, and the absolute impact standard.

The absolute difference standard, also referred to as the absolute disparity standard, "measures representativeness as the difference between the proportions of the population and the source list of prospective jurors that are in the category of interest." Munsterman and Munsterman, *The Search for Jury Representativeness*, 11 Just.Sys.J. 59, 63–64 (1986)(hereinafter referred to as "Munsterman"). Stated another way, it measures the difference between a group's proportion of the population and its proportion in the relevant jury pool. For example, according to the Gelfand Chart, the absolute difference between the number of Puerto Ricans in the age eligible population and those who appear on 1984 Hartford Division Master Jury Wheel is .77%.

The relative difference standard, occasionally referred to as the comparative disadvantage standard, goes one step further and compares the absolute difference to the size of the eligible population. By comparing the absolute difference to the size of the eligible population, the relative difference standard attempts to compare the chance that an age-eligible minority member will be selected for jury service with the chance that a non-minority individual in the age-eligible population will be selected for jury service. For example, the Gelfand Chart reveals that the relative difference in relation to the 1987 Hartford Division Qualified Jury Wheel ranges from 72.2% to 77%. This implies that the chance of selection of a Puerto Rican from the Qualified Jury Wheel is about one-fourth that of any other individual from the age-eligible population on that Wheel.

The statistical decision theory ("STD"), also referred to as the statistical significance theory, "measures the probability that a given difference between the [number of minority members in the] venire and the population could have occur[r]ed by chance in a random drawing from the population." Munsterman at 64. STD attempts to identify the number of minority individuals one would expect to find represented on a randomly selected jury list based upon their proportion of the total population.

Using Dr. Gelfand's figures, the Government supplemented the Gelfand Chart by adding its computations under the absolute impact standard. The absolute impact standard is sometimes referred to as the substantial impact standard. "This index measures representativeness by determining the number of people of a demographic group that would be expected on a venire after a random selection from the population, compared to the number actually present." Munsterman at 64. Simply, it is an alternate way of presenting the analysis suggested by the absolute difference standard in that it is calculated by multiplying the absolute difference by the size of the petit or grand jury panel. For example, an absolute difference of 1% as applied to a panel of 100 jurors would result in an absolute impact of 1 juror. If these figures were applied to the instant challenge, a jury panel of 100 members would have to include one more Puerto Rican juror to be considered truly representative.

The Government represents that the Court should utilize the absolute impact approach. Applicable precedents in this Circuit support this position, that the Court need only determine whether the absolute impact of the alleged underrepresentativeness in this case is significant. *See United States v. Jenkins,* 496 F.2d 57 (2d Cir. 1974), *cert. denied,* 420 U.S. 925, 95 S.Ct. 1119, 43 L.Ed.2d 394 (1975). The defendant, however, relies on dicta in a recent Second Circuit opinion and invites the Court to reject both the absolute disparity and absolute impact theories. *See Alston v. Manson,* 791 F.2d 255, 259 (2d Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1285, 99 L.Ed.2d 143 (1987). The defendant argues that the absolute disparity theory is inappropriate because it allows for the complete exclusion of any minority whose membership is too small to result in a "substantial" figure. The defendant also objects to the absolute impact standard because he feels that a finding of impermissible underrepresentation under that theory is totally dependent on the size of the panel. Under the absolute impact standard, small minorities may be permissibly excluded if the size of the relevant jury panel is

also small. Accordingly, the defendant's statistical expert, Dr. Gelfand, would recommend that the Court should utilize the relative difference standard or SDT because either of these theories focuses on the reduced chance of selection of an age-eligible minority member. *See* Transcript at 33 *et seq.*

## II. DISCUSSION

The Supreme Court has consistently held that the constitutional guarantee of equal protection constitutes a prohibition against underrepresentation of minorities on grand and petit juries which is the product of intentional discrimination. *See, e.g., Rose v. Mitchell,* 443 U.S. 545, 551, 99 S.Ct. 2993, 2997–98, 61 L.Ed.2d 739 (1979); *Alexander v. Louisiana,* 405 U.S. 625, 628–29, 92 S.Ct. 1221, 1224–25, 31 L.Ed.2d 536 (1972); *Hernandez v. Texas,* 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954).

[I]n order to show that an equal protection violation has occurred ... the defendant must show that the procedure employed resulted in substantial underrepresentation of his race or of the identifiable group to which he belongs. The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied.... Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as ... jurors, over a significant period of time.... Finally, ... a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing.... Once the defendant has shown substantial underrepresentation of his group, he has made out a prima facie case of discriminatory purpose, and the burden then shifts to the State to rebut that case.

*Castaneda v. Partida,* 430 U.S. 482, 494–95, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977).

Under the Sixth Amendment, a defendant has a right to a reasonably representa-

tive grand or petit jury. *See, e.g., Taylor v. Louisiana,* 419 U.S. 522, 537, 95 S.Ct. 692, 701, 42 L.Ed.2d 690 (1975). Likewise, the United States has declared the "fair cross section" requirement to be its official policy in the Jury Selection and Service Act of 1968, 28 U.S.C. Sec. 1861 *et seq.* (hereinafter referred to as the "Act"). The "reasonably representative" and "fair cross section" requirements have been construed as functional equivalents. *United States v. Hafen,* 726 F.2d 21, 22 n. 1 (1st Cir.), *cert. denied,* 466 U.S. 962, 104 S.Ct. 2179, 80 L.Ed.2d 561 (1984). Thus, analysis under either the Sixth Amendment or the Act is similar, and the "test for a prima facie case under the sixth amendment is also applied in determining whether a motion under the Act states 'facts which, if true, would constitute a substantial failure to comply with' the fair cross section requirement of the Act." *United States v. LaChance,* 788 F.2d 856, 864 (2d Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 271, 93 L.Ed.2d 248 (1987); *accord United States v. Test,* 550 F.2d 577, 584 (10th Cir.1976).

In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979).

A movant's burden of proof when invoking the protections of either the Sixth Amendment and the Act or the Equal Protection Clause is similar. However, equal protection challenges are not entirely analogous to Sixth Amendment challenges. A primary difference is that, to mount a successful equal protection attack, a defendant must demonstrate intentional discrimination. In equal protection cases, "the significant discrepancy shown by the statistics not only indicate[s] discriminatory

effect but also [is] one form of evidence of another essential element of the constitutional violation—discriminatory purpose." *Id.* at 368 n. 26, 99 S.Ct. at 670 n. 26. In contrast, "in Sixth Amendment fair-cross-section cases, systematic disproportion itself demonstrates an infringement of the defendant's interest in a jury chosen from a fair community cross section. The only remaining question is whether there is adequate justification for this infringement." *Id.*

### A. Jury Selection and Service Act

■ To present a viable challenge under the Act, a defendant must file a motion which contains "a sworn statement of facts which, if true, could constitute a substantial failure to comply" with the Act. 28 U.S.C. Sec. 1867. "The sworn statement requirement was plainly included as a means of discouraging factitious challenges." *United States v. Marrapese*, 610 F.Supp. 991, 996 (D.R.I.1985). Since the procedures set forth in 28 U.S.C. Sec. 1867 are the exclusive means by which a person accused of a Federal crime may challenge any jury on the ground that such jury was not selected in conformity with the provisions of the Act, a defendant's failure to file a sworn statement will result in the automatic rejection of any challenge brought pursuant to the Act. *See, e.g., United States v. Young*, 822 F.2d 1234, 1239 (2d Cir.1987); *United States v. Rosario*, Criminal No. H–86–43, Oral Ruling of the Court, Transcript (filed November 18, 1986) at 7–8 (D.Conn. October 17, 1986) (Cabranes, J.), *aff'd*, 820 F.2d 584 (2d Cir. 1987); *United States v. Foxworth*, 599 F.2d 1, 3 (1st Cir.1979); *United States v. Rodriguez*, 588 F.2d 1003, 1009 (5th Cir. 1979); *United States v. Jones*, 480 F.2d 1135, 1139 (2d Cir.1973).

The defendant is precluded from raising any objections under the Act because he has failed to file a "sworn" statement of facts. The only documents which he has filed in support of his motion to dismiss the indictment and stay the proceedings are the report by Dr. Gelfand and an affirmation by Calixto Torres, a member of Hartford's Puerto Rican community; however, neither

of these statements is sworn. An academically prepared report is unacceptable under the Act if it is unsworn. *United States v. Marrapese*, 610 F.Supp. at 996. Here, the failure to file a sworn statement is particularly inexcusable because the defendant had explicit notice that he had to file a sworn statement in order to establish a prima facie case under the Act. *See* Transcript at 8 (Government argues that the defendant has not submitted a sworn statement.); *see also United States v. Percival*, 756 F.2d 600, 614–15 (7th Cir.1985). The fact that the Court entertained testimony on the issue does not excuse the defendant's failure to comply with this statutory prerequisite. "[E]ven where the defendant ha[s] made an offer of proof and requested permission to subpoena witnesses, his failure to file a motion containing a sworn statement of facts has been held to be fatal under 28 U.S.C. Sec. 1867(d)." *United States v. Marrapese*, 610 F.Supp. at 997 (citing *United States v. Jones*, 480 F.2d at 1139). Accordingly, the defendant's statutory challenge to the grand and petit jury selection procedures in the New Haven and Hartford Divisions is dismissed.

### B. Sixth Amendment Challenge

■ Although it bars him from statutory relief, the defendant's failure to comply with the provisions of the Act does not preclude him from raising a constitutional challenge based on the Sixth Amendment. *United States v. Young*, 822 F.2d at 1239; *United States v. Marcano*, 508 F.Supp. 462, 465 (D.P.R.1980). Accordingly, the Court will determine whether the defendant has established a prima facie case of unconstitutional underrepresentation of Hispanics and Puerto Ricans on juries selected in the New Haven and Hartford Divisions.

#### 1. Cognizable Group

For the purpose of considering the instant challenge, the Court will assume that the defendant has identified a cognizable group. *See United States v. Ayala*, slip op. at 7; *but see Villafane v. Manson*, 504 F.Supp. 78, 80, n. 3 (D.Conn.1980) (Blumen-

feld, J.) (Movant presented other evidence in addition to statistics.)

### 2. Substantial Underrepresentation

The defendant has not shown that Hispanics and Puerto Ricans are "substantially" underrepresented on the grand and petit jury venires in the New Haven and Hartford Divisions. Although the Sixth Amendment guarantees that grand and petit juries will be selected from a pool of names which represents a cross section of the community, it does not require that "juries actually chosen must mirror the community and reflect the various distinctive groups in the population." *Taylor v. Louisiana,* 419 U.S. at 538, 95 S.Ct. at 702. Likewise, neither the jury roll nor the actual venire need "reflect the proportionate strength of every identifiable group." *Swain v. Alabama,* 380 U.S. 202, 208, 85 S.Ct. 824, 829, 13 L.Ed.2d 759 (1965). "The limited scope of the fair cross-section requirement is a direct and inevitable consequence of the practical impossibility of providing each criminal defendant with a truly 'representative' petit jury....." *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 1765, 90 L.Ed. 2d 137 (1986). Therefore, a defendant must demonstrate more than a statistically-significant disparity in order to prevail on a Sixth Amendment challenge; he must demonstrate a disparity which is legally-significant in that it is "substantial." *See Anderson v. Casscles,* 531 F.2d 682, 685 (2d Cir.1976); *United States v. Jenkins,* 496 F.2d at 65.

In *United States v. Jenkins,* the Second Circuit entertained a challenge under the Act and adopted the absolute impact theory to determine whether the statistics revealed "substantial" underrepresentation. 496 F.2d at 66. Because the *Jenkins* Court found that the fair cross section requirement is a "practical one" which focuses on the "difference in absolute numbers rather than the difference in percentages," it held that a statistical discrepancy which amounted to "a difference of one (1) Negro in a panel of 60 jurors is not substantial." *Id.* Thus, under *Jenkins,* "disparities which do not result in a significant numerical difference in the composition of actual

jury arrays are insufficient to establish a violation of the Constitution or the Jury Selection and Service Act." *Alston v. Lopes,* 621 F.Supp. 992, 997 (D.Conn.1985), *aff'd,* 791 F.2d 255 (2d Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 1285, 94 L.Ed.2d 143 (1987).

The defendant's statistics clearly do not demonstrate a substantial underrepresentation of Puerto Ricans on the New Haven and Hartford Division grand and petit jury venires when viewed under the legally-prevailing absolute impact standard. The worst impact demonstrated by Dr. Gelfand's calculations shows a difference in absolute numbers of one and one-quarter Puerto Ricans on the 1987 Hartford Qualified 60 person petit jury venire. *See* Gelfand Chart at n. 2. Since the Court obviously cannot order one-quarter of a person to sit on a jury, this leaves an absolute impact of one, the same discrepancy found insufficient to entitle the movant to relief in *Jenkins.*

The defendant argues that *Jenkins* is not controlling in the instant case because of the Second Circuit's suggestion, in 1986, that "the absolute disparity approach employed in *Jenkins* may be outmoded and should be discarded." *Alston v. Manson,* 791 F.2d at 259; *see Villafane v. Manson,* 504 F.Supp. at 85 n. 9 (questioning the viability of *Jenkins* after *Castaneda v. Partida* ). Nevertheless, in June, 1987, the Second Circuit explicitly declined to elaborate on "what kind of submission might satisfy a 'standard deviation' test while *Jenkins* remains the law in this circuit." *United States v. Rosario,* 820 F.2d 584, 585 n. 1 (2d Cir.1987). Thus, the Court will rest its decision on a finding that the defendant has not met his burden under the absolute impact standard.

### C. Equal Protection Challenge

■ The defendant also claims that the jury selection procedure violates the equal protection clause. The due process clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups. *Wash-*

*ington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1975). An equal protection violation is established only if underrepresentation of a minority is the product of intentional discrimination. *Alston v. Manson,* 791 F.2d at 257.

A tripartite analysis has been employed by the Supreme Court in order to determine whether an equal protection violation has occurred. A prima facie case of discrimination is established if the defendant shows: (1) the group to which he belongs is a cognizable, distinct class; (2) the selection procedure is not racially neutral; and (3) the cognizable group is substantially underrepresented. *Id.* at 256 *citing Castaneda v. Partida,* 430 U.S. at 494, 97 S.Ct. at 1280.

In this case, the defendant has failed to establish a prima facie case of discrimination. Although the first prong of the test is met, the defendant has proffered no evidence which illustrates that the procedure for selecting grand and petit juries in the federal system is susceptible to abuse, i.e., is not racially neutral. Thus, the Court finds it unnecessary to consider whether or not the third prong of the test is met.

### CONCLUSION

The defendant's motion to dismiss the indictment and stay the proceedings is DENIED.

SO ORDERED.