**UNITED STATES of America**

v.

**Luis Colon OSORIO.**

**Crim. No. 2:92CR00032 (TFGD).**

United States District Court, D. Connecticut.

Aug. 26, 1992.

Susan Tipograph, New York City, David N. Rosen, New Haven, Conn., JoNel Newman, Linda Backiel, Conn. Civil Liberties Union, Hartford, Conn., for defendant.

Albert S. Dabrowski, U.S. Atty., John A. Danaher, III, Ronald S. Apter, Asst. U.S. Attys., for plaintiff.

## RULING ON MOTION TO DISMISS INDICTMENT

DALY, District Judge.

Luis Colon Osorio, the defendant herein, has moved to dismiss the indictment filed against him on the grounds that the method of selecting jurors for his grand jury in the Hartford Division of the United States District Court for the District of Connecticut violated (1) the equal protection component of the Due Process Clause of the Fifth Amendment by discriminating against racial and ethnic minorities (*i.e.*, blacks and Hispanics), (2) the fair-cross-section requirement of the Sixth Amendment, and (3) the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861, *et seq.* ("Jury Selection Act" or "the Act"). After carefully considering the parties' extensive briefing and the evidence presented at a two-day hearing, the Court hereby grants the defendant's motion to dismiss for the reasons stated below.

## BACKGROUND

### I. Procedural History

This case has followed a less than direct route toward trial, replete with procedural missteps and false starts. On April 14, 1992, a federal grand jury, H–91–2, drawn from the 1989 Hartford Division jury wheel returned an indictment against the defendant, charging him with two counts of failing to appear in response to a court order in violation of 18 U.S.C. § 3146(a)(1). Following the defendant's arraignment before Magistrate Judge F. Owen Eagan on April 29, 1992, jury selection was initially scheduled for June 2, 1992. On May 22, 1992, attorney Susan Tipograph attempted to file a motion to dismiss the indictment or, in the alternative, to stay the proceedings, contending that the jury selection process in the District violated the Jury Selection Act in that the process systematically underrepresented, *inter alia*, blacks and Hispanics. The motion was returned undocketed to attorney Tipograph, however, because she had failed to file an appearance in this case.[1]

In view of Attorney Tipograph's then pending request for admission to the bar of

---

1. Magistrate Judge Eagan had earlier permitted attorney Tipograph to appear *pro hac vice* for the limited purpose of representing defendant at his arraignment and in connection with matters concerning the conditions of his confinement pretrial.

the District, her refusal to apply for admission *pro hac vice* at the Court's written suggestion, and the defendant's request that she represent him, the jury selection scheduled for June 2, 1992 was continued. On June 5, 1992 and after her admission to the bar, attorney Tipograph filed her appearance in this case. At a hearing held on that day, the Court appointed her as defendant's counsel pursuant to the Criminal Justice Act, continued the case again to the July 7, 1992 calendar call and set a June 10, 1992 filing deadline for any defense motions. Attorney Tipograph resubmitted the defendant's motion to dismiss on June 12, 1992. The Court denied the motion as untimely filed on the ground that it failed to comply with the Act's seven-day filing requirement. *See* June 23, 1992 Ruling. Later reconsidering the decision at the defendant's request, the Court adhered to the Ruling, noting that in addition to being untimely filed pursuant to the Act, the motion to dismiss was also untimely filed under the Court's own scheduling Order.

In conjunction with his motion to reconsider, the defendant also moved to dismiss the indictment on newly raised grounds, contending that the jury selection system violated the Fifth and Sixth Amendments to the United States Constitution. The motion was intended to be supported by a memorandum of law filed by attorney Jo-Nel Newman, a staff attorney with the Connecticut Civil Liberties Union. However, as this Court does not usually permit limited appearances absent some showing of good cause, attorney Newman's motion for leave to file a limited appearance was denied without prejudice. Since attorney Newman's motion was denied, the accompanying memorandum in support of the defendant's motion to dismiss was returned to counsel by the Clerk of the Court. The Court then denied the defendant's motion to dismiss because it lacked a supporting memorandum of law. *See* Loc.R.Crim.P. 1 (incorporating Loc.R.Civ.P. 9(a)(1)).

At the July 7, 1992 calendar call, attorney Newman moved to renew her motion to appear for a limited purpose and to renew the defendant's motion to dismiss. The Court granted these motions and ordered the government to respond to the motion to dismiss by July 24, 1992. The defendant followed the government's timely submission with a reply brief on July 27, 1992. After considering the parties' submissions, and determining that an evidentiary hearing was appropriate, the Court held a hearing on July 28–29, 1992. The parties have since filed post-hearing memoranda, proposed findings of fact and proposed conclusions of law, as well as reply briefs in response to each side's post-hearing pleadings. The Court now considers the Record in this matter closed and the defendant's motion to dismiss ripe for determination.

In view of the Court's prior Rulings twice denying the defendant's challenge under the Jury Selection Act as untimely, the statutory claim will not be revisited. The two constitutional claims remain to be considered.

## II. The District's Jury Selection Plan

As required by the Jury Selection Act, the District of Connecticut has adopted a "Plan for the Random Selection of Grand and Petit Jurors." The District's most recent plan ("the Plan") was adopted on December 4, 1989 *nunc pro tunc* November 19, 1988. Exh. 505 at 14. Except to the extent set forth below, the Court presumes familiarity with the jury selection procedures followed in the District of Connecticut and will not detail them herein. *See United States v. LaChance*, 788 F.2d 856, 862–63 (2d Cir.1986) (setting forth these procedures in detail). Finding that the voter registration lists in the State of Connecticut "represent a fair cross-section of the populace in the District of Connecticut," the Plan provides that the names of all grand and petit jurors serving in the District "shall be selected at random from the latest list of registered voters published by the registrars of the one hundred sixty-nine (169) political subdivisions within the Judicial District, which are available at the time the jury selection process commences." Exh. 505 at 3. For purposes of jury selection, the Plan segregates the Judicial District into three divisions: Hartford, New Haven and Bridgeport. *Id.* at 2. The

Hartford Division encompasses the 84 towns situated in Hartford, Litchfield, Tolland and Windham counties. *See* exh. 515 (listing the 84 towns). The Plan mandates that the Master Jury Wheel ("Master Wheel") for each division be comprised of "[s]ubstantially ten percent" of the names appearing on voter registration lists from those towns within each division. Exh. 505 at 6. The ten percent figure in the 1989 Plan represents a material change from earlier plans whereby the Master Wheel contained only one percent of the names on the voter registration lists.

In April 1989, Kevin Rowe, Clerk of the Court for the District of Connecticut ("Rowe" or "the Clerk"), sent a letter to each town's Registrar of Voters, requesting that each registrar send a copy of either the entire voter registration list or, if within the town's technical capabilities, ten percent of that list. *See, e.g.,* exh. 531 (letter from Rowe to Shelton Registrar of Voters). Rowe included specific instructions in the letter regarding the procedure by which each town would select randomly ten percent of the names on its voter registration list, as well as the proper format for returning the list of names if a town was able to generate the list by computer. On returning the list of names to the Clerk, the Registrar of Voters was to certify in writing that he or she had complied with the procedures detailed in Rowe's letter. If a town returned its entire voter registration list, the Clerk randomly selected ten percent of the names for inclusion in the Master Wheel in the same manner detailed in Rowe's letter. If a town returned only ten percent of its list, that entire list was to be included in the Master Wheel.

By mid-September 1989, Rowe had received a list of names from each of the 84 towns within the Hartford Division. Some registrars provided Rowe with lists of names representing ten percent of the registered voters, while others provided him with a complete list of all the registered voters in their towns. Moreover, Rowe received the lists in varying forms. Some submitted the lists on either computer tape or diskette as set forth in Rowe's letter; others simply provided the information on paper lists. These lists comprise the sole source of names for the Master Wheel in the Hartford Division.[2]

Rowe compiled all the lists and delivered them in October 1989 to Richard Masotta ("Masotta") at the Yale University Computer Center. Masotta, Associate Director of the Computer Center, has an arrangement with the District to build and maintain the master and qualified jury wheels on computer for each of the District's three divisions. He has provided these services to the District since 1981. On receiving the lists, Masotta, with the help of his staff, entered the names into the computer. Access to the computer data base is limited to Masotta and his staff; a password, an identification number and a working knowledge of the computer program are necessary to gain access to the computerized jury lists. The names are entered into the data base by town. In order to "randomize" the list of names, Masotta sorts the list by different parameters, including name and street address, but not by town or zip code. In this way, Masotta testified, the names would be fully mixed and not stored geographically. The current Master Wheel for the Hartford Division contains approximately 68,000 names.

As the need arises, *i.e.,* approximately twice a year, the Clerk directs Masotta to draw approximately 1500 names from the Master Wheel. Using a so-called "random number generator," a sophisticated computer program that generates random numbers, Masotta "randomly" selects the names from the Master Wheel and prints the names and addresses on juror questionnaires to be mailed to prospective jurors. The questionnaires are then delivered to the Clerk, who, in turn, mails the questionnaires to prospective jurors as the pool of eligible jurors runs low.

The instructions on the questionnaire direct the recipient to complete the form and return it to the Clerk within ten days of receipt. The information on the questionnaires is used to determine whether or not

---

**2.** The Master Wheel is emptied and refilled at least once every four years. Exh. 505 at 7.

an individual is qualified for jury service.[3] When the questionnaires are returned,[4] they are sorted by the Clerk into three categories: qualified, unqualified and uncertain. These groupings are then reviewed for accuracy by the Honorable Peter C. Dorsey, a District Judge sitting in the Division who makes a final decision as to whether the assignments in the first two categories are proper and who decides in which of the two categories the "uncertain" names belong. Those who are unqualified are then "excused" from jury duty by the Clerk. The qualified questionnaires constitute the so-called "Qualified Wheel," the source of prospective jurors for all grand and petit jury venires called in Hartford during the life of the Master Wheel. When jurors are needed, names from the Qualified Wheel are selected at random, and jury summonses are mailed to those individuals.

### III. Composition of the Qualified Wheel

Pursuant to the Jury Selection Act and Local Rule of Civil Procedure 12(f)(2), the parties sought and received authorization from the Chief Judge of the District in June 1992 to review the juror questionnaires in the Hartford Qualified Wheel. The raw data compiled by the parties are substantially similar and do not lead to different results when the proper statistical analysis is applied. For the sake of simplicity, the Court adopts the data provided by the defendant.

According to the defendant's figures, there are a total of 1779 juror questionnaires in the Hartford Qualified Wheel. Ninety-two of the questionnaires do not indicate the race of the respondent at all. In an additional 852 questionnaires, the potential juror responded that he or she was "white" but did not indicate whether or not he or she was Hispanic.[5] See Appendix A–1 (sample juror questionnaire which provides a space for the race of the respondent and asks whether the respondent is Hispanic). Fifty-two individuals in the Qualified Wheel identified themselves as "black," and thirteen individuals identified themselves as "Hispanic."

Both parties agree that questionnaires in which there is no indication of race should be omitted in calculating the racial composition of the Qualified Wheel. The government argues further that the Court should also exclude from consideration the questionnaires in which the juror responded that he or she was white but did not respond whether he or she was Hispanic. The government contends that counting these individuals as non-Hispanic whites overstates the alleged underrepresentation of Hispanics in the Qualified Wheel. In support of this proposition, the government cites to *United States v. Biaggi*, wherein the district court excluded from its analysis those questionnaires that "either contained no answer to questions of race and ethnicity or were lost...." 680 F.Supp. 641, 646 (S.D.N.Y.1988), *aff'd*, 909 F.2d 662 (2d Cir.), *cert. den.*, —— U.S. ——, 111 S.Ct. 1102, 113 L.Ed.2d 213 (1990). There is no indica-

---

**3.** Any person is qualified to serve on either a grand or petit jury in this Judicial District so long as he or she is a United States citizen, at least 18 years old, a resident of the District, able to read, write, speak and understand the English language with a reasonable degree of proficiency and neither mentally or physically infirmed, nor convicted of a felony or currently facing a felony charge. Exh. 505 at 3–4. The Plan also provides for three automatic exemptions from jury service and eight excuses from jury service that may be obtained on individual request. *Id.* at 4–5.

**4.** Questionnaires that are returned to the Clerk by the United States Postal Service ("USPS") marked "undeliverable" are retained in storage by the Clerk, who makes no further efforts to contact the addressees. Questionnaires re-

turned by the USPS noting a new address for the addressee are mailed by the Clerk to the new address. Questionnaires that go unanswered are followed up by the Clerk when time permits, but the amount of follow up is generally minimal. *See* Dkt. No. 95 (stipulation regarding the Clerk's handling of undelivered or unreturned juror questionnaires).

**5.** As neither party has offered as an exhibit a sample juror questionnaire, the Court takes judicial notice of the content and the format of the District's juror questionnaires and attaches a copy of such questionnaire to this Ruling as Appendix A. *See* Appendix A at pp. A–1 through A–4.

tion, however, that the district court also excluded questionnaires that, while indicating the respondent was white, did not indicate whether the respondent was also Hispanic. In fact, it appears that the district court did consider those questionnaires, deeming them submitted by non-Hispanic white respondents, a procedure identical to the one suggested by the defendant here. *See* Detre Affid. at 3.

▇ As the Second Circuit has impliedly approved the use of the defendant's suggested method, the Court finds that the questionnaires reflecting no race should be excluded from consideration but that those indicating that the respondent is white but not whether he or she is Hispanic should be considered submitted by non-Hispanic white individuals. So categorized, the Court concludes that 3.08% of the individuals in the Qualified Wheel are black and 0.77% of the individuals are Hispanic. *See* exh. 513.[6] These percentages stand in stark contrast to the 1990 United States Census data indicating that 6.34% of the voting-age population in the Hartford Division is black and 5.07% is Hispanic. *See* exh. 504.

### IV. Exclusion of Hartford and New Britain Residents

Analysis of the Qualified Wheel by town reveals some startling anomalies. Over the life of the current Master Wheel, 4631 questionnaires have been mailed to prospective jurors by the Clerk in order to generate the Qualified Wheel. Not one questionnaire has been mailed to and thus returned from anyone residing in either New Britain or Hartford. The complete absence of either city from the Qualified Wheel, let alone both, raises particular concerns regarding the proper representation of both blacks and Hispanics in the Hartford Division's grand and petit jury veni-

res. Hartford and New Britain are the two largest cities in the Hartford Division, accounting for 16.61% of the total population. More significantly, these two cities combine to account for 62.93% of the voting-age black population and 68.09% of the voting-age Hispanic population in the Division. *See* exh. 512. In other words, while the residents of Hartford and New Britain constitute approximately one-sixth of the total population of the Division, they constitute two-thirds of the minority population. The likelihood that random selection would result in not one Hartford or New Britain resident being drawn from the Master Wheel is less than one chance in $10^{268}$. July 27, 1992 Waldfogel Affid. at ¶ 7. Statistically speaking, the absence of both Hartford and New Britain from the Qualified Wheel cannot be explained by random chance.

The record reveals two distinct reasons for the absence of Hartford and New Britain residents from the Qualified Wheel. With regard to New Britain, no residents' names were ever entered into the Master Wheel. While the evidence is clear that the Clerk received a paper list of voters' names from the New Britain Registrar of Voters and then delivered it to Masotta at the Yale Computer Center, Masotta does not have the list, and the names were never entered into the computer. As no New Britain names were even included in the Master Wheel, they could not logically be randomly selected from that Master Wheel. No New Britain resident thus received a juror questionnaire.

The absence of Hartford from the Qualified Wheel raises a different and even more troubling concern. The Hartford list, contrary to the fate of the New Britain list, actually made it into the computer. There are approximately 5500 Hartford names in the Master Wheel. Even so, out of the

**6.** Racial Composition of Hartford Qualified Wheel

|  |  |  |
|---|---|---|
| Total Jurors | 1779 | |
| No Race Indicated | 92 | |
| Adjusted Total | 1687 | |
| Black | 52 | (3.08%) |
| Hispanic | 13 | (0.77%) |

4631 names purportedly "randomly" drawn from this Master Wheel to date, not a single Hartford resident has been selected to receive a juror questionnaire. The only evidence proffered by the government for the complete absence of Hartford from the Qualified Wheel is Masotta's testimony that the absence is the result of random chance. That testimony is untenable. The likelihood that not a single Hartford name would be randomly drawn during the selection of 4631 names is less than one chance in $10^{174}$, a near statistical impossibility. Waldfogel test. The Court must conclude, therefore, that some other explanation accounts for Hartford's absence.

## DISCUSSION

■ The Supreme Court has recognized that under the Sixth Amendment, "petit juries must be drawn from a source reasonably representative of the community." *Taylor v. Louisiana*, 419 U.S. 522, 538, 95 S.Ct. 692, 702, 42 L.Ed.2d 690 (1975) (holding that the systematic exclusion of women from jury venires violates a defendant's right to an impartial jury drawn from a fair cross section of the community). As the Supreme Court has emphasized, " 'the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof.' " *Duren v. Missouri*, 439 U.S. 357, 363–64, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979) (quoting *Taylor*, 419 U.S. at 538, 95 S.Ct. at 702). The Sixth Amendment does not, however, impose a requirement that a petit jury actually "mirror the community and reflect the various distinctive groups in the population." *Taylor*, 419 U.S. at 538, 95 S.Ct. at 702. To satisfy the Sixth Amendment's requirements the defendant need only be given the *opportunity* for a representative jury, not a representative jury itself. *Biaggi*, 909 F.2d at 678 (2d Cir.1990).

**7.** The defendant criticizes this argument, noting that as Congress enacted the Jury Selection Act over a decade before the *Duren* decision was issued, the federal legislature could not have

## I. Sixth Amendment's Application to Grand Juries

■ Before reaching the merits of the defendant's Sixth–Amendment claim, the Court must first address two preliminary issues raised by the government. Initially, the government contends that the defendant's motion must be denied because the Sixth Amendment's fair-cross-section protection does not apply, by its own force, to grand juries. Rather, the government submits, Congress has by statute extended the fair-cross-section requirement to grand juries by enacting the Jury Selection Act. Govt's Mem. in Opp. at 18. Argues the government, "the fact that Congress drafted the Act so as to make the 'fair cross section' requirement available to both grand and petit juries, suggests that, absent the Act, a fair cross-section analysis would not be available in a constitutional challenge to the composition of a grand jury." *Id.* In the government's view, since the defendant's challenge under the Act has been denied, the constitutional challenge must meet a similar fate because the Sixth Amendment will not extend to a grand jury absent statutory support.

The government primarily relies on the Second Circuit's statement in *United States v. LaChance* that the Act "extends this fair cross section requirement of the Sixth Amendment to the pool from which the federal grand jurors are selected." 788 F.2d 856, 865 (2d Cir.1986) (citing *Duren* for the proposition that the fair-cross-section protection applies to petit juries); *see United States v. Miller*, 771 F.2d 1219, 1227–28 (9th Cir.1985); *United States v. Perez–Hernandez*, 672 F.2d 1380, 1384 (11th Cir.1982); *see also* 28 U.S.C. § 1861 ("It is the policy of the United States that all litigants in Federal Courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross-section of the community in the district or division wherein the court convenes.").[7]

"had a view of *Duren* in mind when it acted." Deft's Reply Mem. at 6 n. 6. The defendant's criticism is misplaced. *LaChance* does not hold, as the defendant suggests, that the Jury

The Court is not persuaded that a Sixth–Amendment challenge against the representativeness of a grand jury venire is determined by the vitality of a similar claim brought under the Jury Selection Act. The government has not cited a single case in which a court has rejected a Sixth–Amendment challenge on the ground that the fair-cross-section protection does not apply to grand jury venires. In fact, the law of the Circuit is otherwise. Two district courts in the Circuit, in decisions affirmed on appeal, have considered on the merits Sixth–Amendment challenges to the composition of Qualified Wheels from which grand juries were drawn independent of a contemporaneous challenge under the Jury Selection Act. *See Biaggi*, 680 F.Supp. at 655; *United States v. Gerena*, 677 F.Supp. 1266, 1273–74 (D.Conn.1986), *aff'd sub nom. United States v. Maldonado–Rivera*, 922 F.2d 934, 970 (2d Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 2858, 115 L.Ed.2d 1025, 1026 (1991). Careful review of both cases refutes the government's contention that the courts considered the Sixth–Amendment claim only because the statutory claim was asserted as well. In an analysis clearly approved by the Second Circuit, the district court in *Biaggi* considered the Sixth Amendment challenge as an independent claim separate from the statutory claim. *See Biaggi*, 909 F.2d at 678 (holding that "rejection of the Sixth Amendment claim, *in the circumstances of this case*, necessarily requires rejection of the statutory claim") (emphasis added). The Second Circuit clearly leaves open the possibility that there may be a set of facts whereby analysis under the Sixth Amendment and the Jury Selection Act would lead to different results. In *Gerena*, the Court addressed the defendants' Sixth–Amendment challenge on its merits after it had

dismissed the statutory challenge on procedural grounds. 677 F.Supp. at 1273 (dismissing claim under Jury Selection Act where defendants failed to file a sworn statement in support of their motion, a statutory prerequisite to relief). In both *Biaggi* and *Gerena* it is clear that the challenges to the selection of federal grand jurors under both the Sixth Amendment and the Jury Selection Act were considered separately, there being no evidence that disposition of the statutory challenge determined whether the respective district courts reached the merits of the constitutional challenge.

Finally, the government has offered no explanation why the scope of the fair-cross-section requirement should be limited to petit juries alone and not extended to grand juries. Such a justification would appear particularly elusive especially where jurors for both grand and petit juries are selected from the same pool of names. For the reasons just stated, the Court finds that the Sixth Amendment's fair-cross-section requirement applies to grand juries irrespective of the applicability of the Jury Selection Act. In view of this finding, the Court also rejects the government's argument that merely because the statutory challenge was untimely filed, the defendant's constitutional challenge was untimely filed as well.

## II. Racial Composition of Defendant's Grand Jury Venire

■ The government next contends that because this defendant's grand jury venire allegedly had proper minority representation, he has no standing to assert a Sixth–Amendment violation based on alleged underrepresentation of blacks and Hispanics

---

Selection Act extended a constitutional protection *first* recognized in *Duren*. The right to a fair-cross-section of the community on a federal petit jury is a long-recognized right dating back to at least *Smith v. Texas*, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84 (1940). *Taylor*, 419 U.S. at 527–528, 95 S.Ct. at 696 ("[T]he [Supreme] Court has unambiguously declared that the American concept of the jury trial contemplates a jury drawn from a fair cross section of the community.").

Congress simply gave legislative effect to this protection when it enacted the Jury Selection Act. *Taylor*, 419 U.S. at 529–30, 95 S.Ct. at 697 (recognizing that Congress relied on prior Supreme Court rulings as a legal foundation for the fair-cross-section protection when enacting the Jury Selection Act). Therefore, the fact that the Act was enacted prior to *Duren* does not undercut the government's argument.

in the Qualified Wheel.[8] In other words, because the defendant's 50–person grand jury venire contained two Hispanics and one black, the government asserts that he has not been "injured" in any way by whatever underrepresentation may exist in the Qualified Wheel. The defendant counters that the degree of minority representation on his own grand jury venire is not legally relevant if the Qualified Wheel itself systematically underrepresents blacks and Hispanics. The Court finds the defendant's position more tenable.

As already noted, the Sixth Amendment guarantees only the opportunity for a representative jury, not a representative jury itself. *Biaggi*, 909 F.2d at 678. The focus, therefore, is properly placed on the procedure of selecting juries, not on the outcome of that process.

> If the right were not to a "fair cross section procedure," (one free of a systematically eliminating bias and drawing from a representative source) but to a particular outcome, a party would be entitled to challenge his particular jury panel if it did not fairly represent the community. But, as *Taylor* holds, a party is not so entitled. It follows that the dimensions of the right to an impartial jury are described in procedural terms.

*McGinnis v. M.I. Harris, Inc.*, 486 F.Supp. 750, 756 (N.D.Tex.1980). Focusing on the outcome, as one court has noted, undermines the constitutional protection.

> To hold that a litigant is not entitled to a representative jury when the jury venires are drawn from a fair cross section of the community, but that the cross-section requirement can be dispensed with when the dice fall a particular way in an individual case undermines the analytical foundation upon which the right to a jury drawn from a cross-section of the community is brought.

*Barber v. Ponte*, 772 F.2d 982, 992 (1st Cir.), *rev'd on other grounds*, 772 F.2d 996

(1st Cir.1985) (*en banc*), *cert. denied*, 457 U.S. 1050, 106 S.Ct. 1272, 89 L.Ed.2d 580 (1986). That the process itself must pass constitutional muster regardless of the fact that the actual outcome may reflect a proper representation is consistent with the Supreme Court's decisions in other areas involving discrimination. *See, e.g., Batson v. Kentucky*, 476 U.S. 79, 96, 106 S.Ct. 1712, 1723, 90 L.Ed.2d 69 (1986) (test for determining whether use of peremptory challenge unconstitutionally excluded a protected group considers the prosecutor's reasons for exercising the strike, not whether the resulting jury panel was racially balanced); *Connecticut v. Teal*, 457 U.S. 440, 451, 102 S.Ct. 2525, 2532–33, 73 L.Ed.2d 130 (1982) ("The suggestion that disparate impact should be measured only at the bottom line ignores the fact that Title VII guarantees individual respondents the *opportunity* to compete equally with white workers on the basis of job-related criteria.") (emphasis in original).

The government insists that "[r]egardless of whether the constitutional guarantee was provided by chance or by design, the fact that it was provided must be the end of the question." Govt's Post–Hrg Mem. at 11. The Court finds the government's proposed "no harm, no foul" rule particularly inappropriate, however, since the Supreme Court has recognized that more than just the defendant's interest is at stake in a fair-cross-section claim. " '[T]he broad representative character of the jury should be maintained, partly as assurance of a diffused impartiality and partly because sharing in the administration of justice is a phase of civic responsibility.' " *Taylor*, 419 U.S. at 530–31, 95 S.Ct. at 697–98 (quoting *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 227, 66 S.Ct. 984, 989, 90 L.Ed. 1181 (1946) (Frankfurter, J., dissenting)). As the Supreme Court emphasized, "[c]ommunity participation in the administration of justice of the criminal law

---

8. As the Court finds that the actual degree of minority representation on the defendant's venire is constitutionally irrelevant where the defendant is challenging the composition of the Qualified Wheel, the Court need not reach the question of whether the defendant's actual venire

had proper minority representation. *See infra* pp. 975–76. Thus, for purposes of this Ruling, the Court assumes *arguendo* that the defendant's actual grand jury venire did, in fact, reflect a fair cross section of the community.

... is not only consistent with our democratic heritage but is also critical to public confidence in the fairness of the criminal justice system." *Taylor*, 419 U.S. at 530, 95 S.Ct. at 698. A jury selection process that systematically and substantially underrepresents blacks and Hispanics yet unexpectedly yields a representative venire by mere happenstance in this case can hardly be said to promote that public confidence. Nor is this a case where the public's interest in enforcing judgments outweighs its interest in broad participation in the administration of justice. As no trial has been held, there is no judgment to enforce. *See Barber*, 772 F.2d at 992; *cf. United States v. Mechanik*, 475 U.S. 66, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986) (holding that as a guilty verdict established probable cause to indict, a procedural error in the grand jury was harmless error).

In considering a petitioner's assertion that Missouri petit juries unconstitutionally underrepresented women, the Supreme Court in *Duren v. Missouri* appeared to hold that if the actual venire has proper minority representation, a defendant cannot establish a *prima facie* Sixth–Amendment violation: "[I]n order to establish a prima facie case, it was necessary for petitioner to show that the underrepresentation of women, generally *and on his venire*, was due to their systematic exclusion in the jury-selection process." 439 U.S. at 366, 99 S.Ct. at 669 (emphasis added). The *Duren* Court's analysis of the fair-cross-section claim belies the government's contention, however, that proper racial representation on the jury venire is dispositive of the Sixth–Amendment claim. The Supreme Court conspicuously omitted any finding that the actual jury venire before it did, in fact, suffer from an underrepresentation of women. Rather, the Supreme Court limited its analysis to the issue of whether women were substantially underrepresented on jury venires *in general*. *Id.* at 366–67, 99 S.Ct. at 669–70.[9] Thus, the *Duren* Court did not require that the petitioner's own venire reflect substantial underrepresentation of a distinctive group before he could prevail.

Recent Second Circuit decisions support the conclusion that the racial composition of this defendant's venire is irrelevant to an evaluation of a Sixth–Amendment claim grounded in the contention that the Qualified Wheel systematically underrepresents blacks and Hispanics in grand jury venires. In both *Maldonado–Rivera* and *Biaggi*, the district courts and Second Circuit omitted any reference to, let alone any analysis of, the racial composition of the particular defendant's grand jury venire. *Maldonado–Rivera*, 922 F.2d at 970; *Biaggi*, 909 F.2d at 678. The sole focus was on the racial composition of the qualified jury wheels. Nor does the government's reliance on *Anderson v. Casscles* support its contention that the racial composition of the actual venire is dispositive. 531 F.2d 682 (2d Cir.1976). In contrast to the case at bar, the habeas petitioner in *Anderson* challenged the racial composition of his venire and not the composition of the qualified wheel. The Second Circuit thus logically limited its review to an analysis of the petitioner's venire. *Id.* at 685 & n. 1.

In sum, as the defendant herein alleges that the Qualified Wheel systematically underrepresents blacks and Hispanics, the Court must analyze the racial composition of that "pool" of names, not the composition of the defendant's own venire.

### III. Sixth Amendment Claim

▪ The Supreme Court has established a three-part test for evaluating a fair-cross-section claim. In order to establish a *prima facie* violation of the Sixth Amendment's fair-cross-section requirement, the defendant must show

(1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in

---

**9.** The Supreme Court did take note of the number of women on the petitioner's venire (5 out of 53 people) but made no further reference to the composition of that venire, nor analyzed whether there was a substantial underrepresentation of women on that venire. *Id.* at 363, 99 S.Ct. at 668.

relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren,* 439 U.S. at 364, 99 S.Ct. at 668. There is little question, and the government concedes, that both blacks and Hispanics are "distinctive" groups in the community for purposes of this analysis. *See LaChance,* 788 F.2d at 864 (blacks); *United States v. Jenkins,* 496 F.2d 57, 65 (2d Cir.1974) (blacks), *cert. denied,* 420 U.S. 925, 95 S.Ct. 1119, 43 L.Ed.2d 394 (1975); *Biaggi,* 680 F.Supp. at 648 (blacks and Hispanics); *Gerena,* 677 F.Supp. at 1273–74 (Hispanics).

■ The second prong requires the Court to determine whether either or both of these two "distinctive" groups is "substantially underrepresented" in the Qualified Wheel. *Biaggi,* 909 F.2d at 677. In analyzing whether a qualified wheel substantially underrepresents a particular group, the Second Circuit has adopted the so-called "absolute numbers" or "absolute impact" approach. *Biaggi,* 909 F.2d at 678; *Jenkins,* 496 F.2d at 65.[10] This statistical analysis measures the degree of underrepresentation by determining how many individuals from the distinctive group would have to be added to a typical venire to account fully for the exclusion of that group from venires in general. *See Jenkins,* 496 F.2d at 65. The analysis involves two steps. First, the Court must calculate "the difference between a group's proportion of the population and its proportion in the relevant jury pool." *Gerena,* 677 F.Supp. at 1271. Next, that percentage difference is multiplied by the size of a typical venire in order to determine the number of individuals from the distinctive

group that have to be added to the venire to account for the group's underrepresentation. *Id.*[11]

A preliminary step in measuring the degree of underrepresentation in the qualified wheel is the calculation of the relevant "benchmark," that is, the basis of comparison from which to measure the extent of the underrepresentation of the group in the qualified wheel. "[T]he defendant must demonstrate the percentage of the community made up of the group alleged to be underrepresented, for this is the conceptual benchmark for the Sixth Amendment fair-cross-section requirement." *Duren,* 439 U.S. at 364, 99 S.Ct. at 668. Ideally, the benchmark is the percentage of the community that is eligible for jury service. *LaChance,* 788 F.2d at 865 (first step is to determine "how many members of the allegedly underrepresented group would be expected to appear on the jury panel in order to reflect the percentage of the group in the total population *eligible for jury service*") (emphasis added); *see Taylor,* 419 U.S. at 531, 95 S.Ct. at 698 (Louisiana stipulated that women represented 53% of the citizens eligible for jury service). Data as to the population eligible for jury service are rarely available, however, and federal courts typically rely on voting-age population, a figure readily available in census data, as a proxy. *E.g., Duren,* 439 U.S. at 364–65, 99 S.Ct. at 668–69; *Biaggi,* 909 F.2d at 677; *LaChance,* 788 F.2d at 868; *Jenkins,* 496 F.2d at 65; *Gerena,* 677 F.Supp. at 1269–70.

■ The government argues that using voting-age population as a benchmark artificially inflates the level of minority underrepresentation in the Qualified Wheel because that benchmark includes individuals who are ineligible for jury service, while

---

**10.** To the extent the defendant asks the Court to apply a different statistical method in evaluating his Sixth–Amendment claim, the Court rejects the request. The Second Circuit has recently declined to abandon the test adopted in *Jenkins,* and this Court is bound to follow its lead. *See Maldonado–Rivera,* 922 F.2d at 970.

**11.** As the Court in *Gerena* explained,
[f]or example, an absolute difference [between the number of Hispanics in the com-

munity and the number of Hispanics in a typical venire] of 1% as applied to a panel of 100 jurors would result in an absolute impact of 1 juror. If these figures were applied to the instant challenge, a jury panel of 100 members would have to include one more [Hispanic] juror to be considered truly representative.
*Id.*

the qualified wheel does not (*e.g.*, convicted felons, non-citizens, persons who do not understand or speak English). In its stead, the government suggests that the Court adopt the pool of registered voters as the applicable benchmark because it is a "better estimate of the percentage of *qualified* prospective minority jurors in the Hartford division...." Govt's Post–Hrg Mem. at 15 n. 5 (emphasis added). Even assuming that use of the voting-age population as a benchmark would overstate the degree of minority underrepresentation in the Qualified Wheel, the Court rejects the alternative use of registered voters as an appropriate benchmark. Simply put, the government's evidence does not reliably establish that this alternative benchmark would be a better estimate of the jury-eligible population than the voter-age population would be. The extent of the statistical problems with the government's expert's outdated and otherwise unreliable evidence is well presented in the defendant's post-hearing submission, and the Court will not endeavor to recapitulate that discussion here. *See* Deft's Post–Hrg Mem. at 14–18. Accordingly, for the reasons set forth herein and in the defendant's post-hearing memorandum, the Court adopts the voting-age population in the Hartford Division, as reported in the 1990 Census, as the benchmark for properly calculating the extent of the underrepresentation of blacks and Hispanics in the Qualified Wheel.

▮ Applying the absolute disparity test to the applicable data, *see supra* p. 11, reveals that the underrepresentation is 3.26% for blacks (6.34% − 3.08%) and 4.30% for Hispanics (5.07% − 0.77%). To eliminate these disparities, the District would have to add two blacks and two Hispanics to a typical fifty-person grand jury venire. This level of underrepresentation has been found to be *in* substantial for Sixth Amendment purposes. *Biaggi*, 909 F.2d at 678–79 (holding that disparity of two blacks and two to three Hispanics in a fifty- to sixty-person venire comports with the fair-cross-section requirement).

The Court finds, however, that the *Biaggi* holding is not controlling on this record.

Initially, the Court notes *Biaggi*'s warning regarding the use of the "absolute numbers" analysis:

The risk of using this approach is that it may too readily tolerate a selection system in which the seemingly innocuous absence of small numbers of a minority from an average array creates an unacceptable probability that the minority members of the jury ultimately selected will be markedly deficient in number and sometimes totally missing. Of course, the Sixth Amendment assures only the *opportunity* for a representative jury, rather than a representative jury itself, ... but that opportunity can be imperiled if venires regularly lack even the small numbers of minorities necessary to reflect their proportion of the population.

*Id.* at 678 (emphasis in original). More importantly, the Second Circuit recognized that the degree of underrepresentation experienced in *Biaggi* "press[ed] the *Jenkins* 'absolute numbers' approach to its limit" and stated that it "would find the Sixth Amendment issue extremely close *if the underrepresentations had resulted from any circumstance less benign than use of voter registration lists.*" *Id.* at 679 (emphasis added).

The facts herein reveal circumstances far less benign than the use of voter registration lists. *Biaggi* was not faced with a situation where roughly one-third (27 of 84) of the towns within the division were not represented on the Qualified Wheel. Furthermore, *Biaggi* did not see the total exclusion from the Qualified Wheel of the two largest cities in the Division, cities accounting for one-sixth of the total population and two-thirds of the minority population in the Division. Finally, this case illustrates the problem in applying the "absolute numbers" approach followed in *Biaggi*. Given the small percentage of voting-age blacks and Hispanics residing within the Hartford Division (6.34% and 5.07% respectively as compared to 19.9% and 15.7% within the Manhattan Master Wheel of the Southern District of New York in *Biaggi*), the absence of a representative sample of blacks and Hispanics in the Qualified Wheel leads to the "unacceptable

probability" that the minority members of the jury ultimately selected will be markedly deficient in number and, in most cases, totally missing. *See id.* at 678.[12]

The government misses the lesson in *Biaggi* when it argues that even though Hartford and New Britain were inadvertently excluded from the Qualified Wheel, their absence was sufficiently counterbalanced by the exclusion of a number of towns with large white populations and the over-inclusion of towns with above-average minority populations, *e.g.*, Bloomfield. The under-representation of blacks and Hispanics was held to be "benign" in *Biaggi* because there was no evidence that any circumstances other than the random selection of names from voter registration lists created that underrepresentation. 909 F.2d at 678. In contrast, the exclusion of Hartford and New Britain from the Qualified Wheel, an occurrence not the result of random chance, is not "benign" as that term is understood by the Court. The fact that the government resorts to an argument that the effect of the Hartford and New Britain's exclusion has been mitigated reflects even the government's recognition that the level of underrepresentation of blacks and Hispanics would have been greater had there not been some over-representation of other cities.

The lack of random selection in the compilation of names for the Qualified Wheel is what makes the circumstances here less benign than in *Biaggi.* Accordingly, as *Biaggi*'s holding does not control in this case and as circumstances less benign than voter registration lists have led to minority underrepresentation in the Qualified Wheel, the Court finds that, on the facts in this case, a racial disparity requiring the addition of two blacks and two Hispanics to an average grand jury venire constitutes substantial underrepresentation under the Sixth Amendment.

▇ The final element the defendant must establish in order to make out a *prima facie* Sixth–Amendment violation is that the substantial underrepresentation is the result of a "systematic exclusion in the jury-selection process." *Duren,* 439 U.S. at 366, 99 S.Ct. at 669. A jury selection system that relies on voter registration lists does not systematically exclude blacks and Hispanics as long as there is no discrimination in the compilation of the voter registration lists and "*all parts* of the process are done by random selection." *United States v. Young,* 822 F.2d 1234, 1239 (2d Cir.1987) (emphasis added); *see Duren,* 439 U.S. at 366, 99 S.Ct. at 669 ("There was no indication that underrepresentation of women occurred at the first stage of the selection process.... The first sign of systematic discrepancy [was] at the next stage—the construction of the jury wheel from which persons are randomly summoned for service.").

▇ The exclusion of Hartford and New Britain satisfies the last element of the defendant's *prima facie* claim. The Court finds that the exclusion of approximately two-thirds of blacks and Hispanics in the Division as a source of names for jury selection constitutes "systematic exclusion" of those groups from the jury-selection process. *Duren,* 439 U.S. at 366, 99 S.Ct. at 669. The government's arguments to the contrary are not persuasive. The government argues that the exclusion is not systematic because (1) the District's Plan does not provide for the exclusion and (2) the exclusion was due to a "correctable, mechanical error"[13] and thus was not the result of any intentional conduct. Govt's Post–Hrg Reply Mem. at 9. Neither of these arguments undermines the Court's

---

**12.** For example, assuming random selections from the Qualified Wheel, 85% of all grand and petit jury panels will not have a single Hispanic individual as compared to approximately 30% of all grand jury panels drawn from a properly representative wheel. Exh. 509, Waldfogel test. Similar percentages for blacks on the Qualified Wheel were not presented to the Court.

**13.** There is no evidence in the record to support the government's assertion that the exclusion of the Hartford names in the Qualified Wheel was the result of a "correctable, mechanical error." The only direct evidence on this exclusion is Masotta's testimony that it was due to random chance. Neither he nor any other witness testified that the exclusion of the Hartford names was the result of any other cause.

finding. First, in spite of the testimony of one of its witnesses, even the government concedes that the exclusion was not due to random chance. Govt's Proposed Findings of Fact No. 12. Next, that the Plan does not call for the exclusion is not dispositive of the issue. As in *Duren*, the system need not require the exclusion of the underrepresented group; rather, if the effect of implementing the plan leads to systematic (i.e., not occasional) exclusion, this prong is satisfied. *See Duren*, 439 U.S. at 366–67, 99 S.Ct. at 669–70. Finally, the government argues strenuously that the exclusion in this case cannot be systematic because no one intended to exclude Hartford and New Britain residents from the Qualified Wheel. Even assuming that there was no such intent, such a finding would not be dispositive on this question. A showing of discriminatory intent is not an element of a fair-cross-section claim. *Biaggi*, 909 F.2d at 678. Since not one venire selected from the Qualified Wheel as presently constituted will contain a single resident from either Hartford or New Britain, the exclusion of Hartford and New Britain residents is systematic. Given the racial composition of these two cities, their systematic exclusion will necessarily systematically exclude blacks and Hispanics on jury venires selected from this Qualified Wheel. *See supra* note 12.

■ In view of the foregoing, the Court finds that the defendant has established a *prima facie* fair-cross-section violation.

This finding does not, however, end the inquiry into whether the Sixth Amendment has been violated. *Duren*, 439 U.S. at 367, 99 S.Ct. at 670. The government is entitled to establish that the systematic underrepresentation of blacks and Hispanics on the Qualified Wheel serves a significant governmental interest. *Id.* To its credit, the government has not even attempted to satisfy this burden. "The defendant claims that the exclusion of Hartford and New Britain serves no conceivable public purpose, and *the Government agrees with that assertion.*" Govt's Post–Hrg Reply Mem. at 8 (emphasis added). As the government has failed to rebut the defendant's *prima facie* showing, the Court finds that the complete exclusion of residents from both Hartford and New Britain in the Qualified Wheel violated the defendant's Sixth Amendment right to a fair cross section of the community on his grand jury venire.[14]

## CONCLUSION

For the reasons stated herein, the Court finds that the defendant has been denied his Sixth–Amendment right to a fair cross section of the community in the Hartford Division Qualified Wheel. Accordingly, the defendant's motion to dismiss is hereby GRANTED on that basis and the indictment in this matter hereby ORDERED dismissed.

SO ORDERED.

---

**14.** In view of this finding, the Court declines to reach the merits of the defendant's Fifth-Amendment claim.

# APPENDIX A

PLEASE READ LETTER OF INSTRUCTION AT BACK OF ENVELOPE

before mailing — fold along these vertical red lines

**FOR OFFICIAL USE ONLY**

| | |
|---|---|
| 1 QUALIFIED | 4 EXEMPT |
| 2 DISQUALIFIED | 5 EXCLUDED |
| 3 EXCUSED | 6 OTHER |

## REMARKS

(USE SPACE BELOW TO COMPLETE ANY ANSWERS ON QUESTIONNAIRE WHICH REQUIRE MORE INFORMATION OR MORE SPACE. SHOW THE NUMBER(S) OF QUESTIONS TO WHICH YOU ARE FURTHER RESPONDING

(fold lines)

## NOTES REGARDING THE QUALIFICATION FORM

**Question 3 - RESIDENCE.** If you answered "N.O", that you have not lived in the same state or same county for the past year, name the other states and counties where you lived, and give dates

**Question 5 and 6 - CRIMINAL RECORD.** If your answer to either question 5 or 6 is "YES", please show under "Remarks": a) date of the offense, b) date of the conviction (or date of pending charge), c) the sentence imposed (if a conviction), and d) the name of the court One is disqualified from jury service only for criminal offenses punishable by imprisonment for more than one year, but it is the maximum penalty, and not the actual sentence, which controls

**Question 8 - YOUR HEALTH.** If you claim a mental or physical disability please explain and give evidence of it either under "Remarks" section or by attaching a separate letter.

**NOTE** - Do not ask the court to call your doctor. Any doctor's statement you obtain regarding your physical condition must be sent to the court by you rather than by the doctor.

**Question 10 - RACE.** Federal law requires you as a prospective juror to indicate your race This answer is required solely to avoid discrimination in juror selection and has absolutely no bearing on qualifications for jury service By answering this question you help the federal court check and observe the juror selection process so that discrimination cannot occur In this way the federal court can fulfill the policy of the United States which is to provide jurors who are randomly selected from a fair cross section of the community

**Question 12 - OCCUPATION.** Federal law requires that you answer the questions about your occupation so that the Federal Courts may determine promptly whether you fall within an excuse or exemption category (See Questions 13 & 14)

**Question 14 - GROUNDS FOR EXCUSE.** If you have indicated that you wish to be excused because you belong to one of the categories of persons that may be excused, please make sure you give, under "Remarks", such additional information as may be requested in the Instructions Letter where it describes the excuse category. For example, if you claim an excuse because you are "Over 70 Years of Age" you must show under "Remarks" the Month, Day and Year of your birth

**Box Number 15 - YOUR SIGNATURE.** Be sure you have signed the form If another person had to fill out this questionnaire for you, that person must indicate his or her name, address and reason why under "Remarks"

# LETTER OF INSTRUCTIONS FROM UNITED STATES DISTRICT COURT TO A PROSPECTIVE JUROR

## PART 1

**Dear Prospective Juror:**

Your name has been drawn by lot, and you are being considered for jury service in the United States District Court Trial by jury is a keystone of our system of justice Jury service is therefore both an opportunity and an obligation of every American. Jurors will receive mileage and, unless they are Federal government employees, $30.00 per day for each day of service

**This is not a summons for jury service.** It is a way of obtaining some information about you from which we can objectively determine whether you are qualified to serve pursuant to federal law. Please answer each question, sign and return the form within ten days If we find you qualified, you may be summoned at a later time

If you are unable to fill out this form, someone else may do it for you provided that person explains in the Remarks section of the form why it was necessary for them to do it instead of you

**If you do not return this questionnaire form, fully completed, within ten days you may be summoned to report to this office at your expense to complete the questionnaire.**

If you show, in answer to question 8, that you have a physical or mental infirmity, please attach evidence of your infirmity.

There are certain grounds for exemption from jury service which are described at question 13. Also there are grounds for requesting excuse but these are available only to those categories of persons, if any, listed at the right

## PART 2
### GROUNDS FOR REQUESTING EXCUSE

(Category number)

**Are you:**

**(1)** Over 70 years of age (if so, give mo. day & year of birth under "Remarks")

**(2)** A person who has served as a grand or petit juror within the last 2 years (give name of court and dates you served under "Remarks" section).

**(3)** A person who serves without compensation as a volunteer firefighter or a member of a rescue squad or ambulance crew for a public agency including the District of Columbia and territories of the United States or local government (describe your service and identify the agency for which you work under "Remarks" section).

[illegible text]

If one of the above categories applies to you and you wish to be excused for that reason write the number of your category in the box at Question 14 on the Juror Qualification form.

Others may be excused only by showing at such time as they may be summoned that the jury service would cause them undue hardship or extreme inconvenience. Do not ask to be excused by telephone. IF YOUR ADDRESS CHANGES AFT... YOU HAVE RETURNED THE QUESTIONNAIRE, PLEASE NOTIFY THE COURT PROMPTLY BY LETTER OR POST CARD, ADDRESSING IT TO "ATTENTION JURY CLERK"

**DO NOT RETURN THIS LETTER WITH THE QUESTIONNAIRE**

**CLERK,
UNITED STATES DISTRICT COURT**

984

INSTRUCTIONS TO GROUNDS FOR RE-
QUESTING EXCUSE

1—Over 70 years of age—give date of birth in "remarks" section on reverse of questionnaire.

2—A Person who has served as a juror within the last 2 years (give name of Court and dates of service in "remarks" section on reverse of questionnaire)

3—Person having active care and custody of a child or children under 12 years of age whose health and/or safety would be jeopardized by your absence for jury service; or a person who is essential to the care of aged or infirm persons. (explain fully in "remarks" section on reverse of questionnaire)

4—Persons whose services are so essential to the operation of a business, commercial, or agricultural enterprise that it must close or cease to function if you are required to perform jury duty. (explain fully in "remarks" section on reverse of questionnaire)

5—Attorney
6—Physician
7—Dentist
8—Registered Nurse
9—Member of the Clergy or a Religious Order
10—School Teacher