UNITED STATES of America,

v.

Alvaro GARCES, a/k/a "Alpert Sanchez," Eugenio Melo, a/k/a "Tony", Armando Melo, Fernando Melo, Jorge Busta-mante, Adolpho Gallego, Harold Lopez, Jose Sanchez and Rosa Elena Reina, Defendants.

No. 93–CR–1018 (TCP).

United States District Court,
E.D. New York.

April 12, 1994.

Zachary Carter, U.S. Atty. by Cecilia Gardner, Garden City, NY, for the U.S.

Bert H. Nisonoff, Forest Hills, NY, for defendant Alvaro Garces.

Samuel Viruet, New York City, for defendant Eugenio Melo.

Martin G. Goldberg, Franklin Square, NY, for defendant Rosa Elena Reina.

Raymond B. Grunewald, New York City, for defendant Jose Sanchez.

## MEMORANDUM AND ORDER

PLATT, Chief Judge.

Defendant Alvaro Garces, joined by defendants Eugenio Melo, Rosa Elena Reina and Jose Sanchez, move this Court to (1) transfer this case from the United States District Courthouse in Uniondale, New York to the Courthouse in Brooklyn, New York pursuant to the Court's Guidelines for the Division of Business among District Judges 50.1(d)(3) and 50.2(f) [1], and on the additional grounds that the rules for empaneling the trial jury veniremen at the Uniondale Courthouse violate the Fifth and Sixth Amendments of the United States Constitution and the Jury Selection and Service Act (28 U.S.C. §§ 1861–1969 (1988)), or (2) select the petit jury in this case from a Master List which consists of people from all five Counties in the Eastern District. For the reasons stated herein, the Court denies defendants' motions in all respects.

## BACKGROUND

Defendant Alvaro Garces was arrested on August 27, 1993 on the basis of a criminal complaint sworn out by Stephen Clarke, a Special Agent of the Drug Enforcement Agency. This complaint alleges that the defendants Alvaro Garces and Eugenio Melo did knowingly and intentionally possess with the intent to distribute heroin and cocaine. See Defendant Garces' Exhibit G.[2] An indictment was returned by a grand jury sitting in Uniondale against Alvaro Garces on

---

1. A motion or objection under this section must be made "within ten days from arraignment or from initial notice of appearance, whichever is earlier." Defendants Alvaro Garces and Eugenio Melo first appeared and were arraigned on the initial indictment in this case on September 3, 1993, yet it was not until October 11, 1993 that Mr. Garces' attorney noted his objection by letter and filed his motion on October 15, 1993. Mr. Melo's attorney joined in that objection by filing a motion on October 29, 1993. Defendant Rosa Elena Reina first appeared on October 10, 1993, was arraigned on October 22, 1993 and objected on December 1, 1993, while defendant Jose Sanchez first appeared and was arraigned on October 29, 1993, and joined in defendant Garces' motion on November 15, 1993. As a result, the objections and subsequent motions made pursuant to this section are untimely, yet the Court will entertain and address the merits of the motion nevertheless.

2. The version submitted with defendants' motions is incorrect. The original and correct version is in the Court file.

September 9, 1993. Pursuant to a complaint dated September 11, 1993 by Louis Isnardi of the Long Island Drug Enforcement Task Force, defendants Jorge Bustamante, Adolpho Gallego, Harold Lopez, Jose Sanchez and Rosa Elena Reina were arrested for alleged charges that they did knowingly and intentionally conspire with the intent to distribute cocaine within the Eastern District of New York. This complaint alleges a scheme in which drugs were concealed in the roofs of motor homes and driven throughout California, New York and elsewhere to be distributed. *See* Defendant Garces' Exhibit F.

The two-count Indictment which initiated this case was filed on September 9, 1993 and charges that between July, 1992 and August 27, 1993, defendants Alvaro Garces, Eugenio Melo and others did conspire to distribute and to possess with the intent to distribute heroin and cocaine, and that on or about July 27, 1992, within the Eastern District and elsewhere, defendants Alvaro Garces and Eugenio Melo did possess with intent to distribute heroin. The Criminal Case Information Sheet filed with the Indictment indicates that this matter arose within Nassau and Queens. *See* Defendant Garces' Exhibit E: "Criminal Case Information Sheet."

Subsequently, on September 30, 1993, a Superseding Indictment, consisting of four counts, was filed in this case which added the remainder of the defendants and additional counts which alleged that all defendants conspired to distribute and possess with intent to distribute heroin and cocaine between October, 1989 and August 27, 1993; that defendants Alvaro Garces, Eugenio Melo and Armando Melo did possess with intent to distribute heroin on or about July 27, 1992; and, that defendants Eugenio Melo, Armando Melo and Fernando Melo did possess with the intent to distribute heroin on or about March 4, 1993. *See* Defendant Garces' Exhibit A.

On October 15, 1993, defendant Alvaro Garces moved to transfer this case to the Brooklyn Courthouse or to have the jury venire chosen from a Master List consisting of jurors from all five Counties that constitute the Eastern District of New York. Defendants Eugenio Melo, Rosa Elena Reina and Jose Sanchez joined in this motion on October 22, 1993, December 1, 1993, and November 15, 1993, respectively.

## DISCUSSION

### 1. Challenges to the Jury Pool Plan

As initiated some 15 or 16 years ago, modified on May 21, 1985, (and approved by the Judicial Council), and surviving through a modification of 1988 which was never implemented and a modification of June 15, 1993, the Jury Selection Plan of the Eastern District of New York provides that a Master Jury Wheel for the Brooklyn Courthouse shall utilize the names of persons from all five Counties of the Eastern District, and that a Long Island Division, comprised of the courthouses in Uniondale and Hauppauge, shall utilize the names of persons from Nassau and Suffolk Counties. *See* Def. Garces' Exh. B: "Jury Selection Plan," § 5. This last Plan, modifying the 1985 Plan, was adopted by the Eastern District Board of Judges on June 15, 1993, (*see* Def. Garces' Exh. C), and was approved by the Second Circuit Judicial Council on June 22, 1993.

Initially, defendants argue for a jury pool called from the entire District on the basis that the Jury Selection Plan in the Eastern District of New York violates the Fifth and Sixth Amendments and the Jury Selection and Service Act, 28 U.S.C. §§ 1861–1969, since jurors for the Long Island Courthouses are chosen from Nassau and Suffolk Counties while jurors for the Brooklyn Courthouse are chosen from all five Counties of the District. Defendants claim that there is an "unacceptably low proportion of Black and Hispanic jurors in the Long Island Division," (Affidavit of Bert Nisonoff, Esq., p. 3), making the jury pools in Uniondale and Hauppauge unrepresentative of the District as a whole.

Secondly, defendants move pursuant to the Guidelines of the Eastern District of New York, 50.1(d)(3) and 50.2(f) for transfer of this case to Brooklyn on the basis that the crimes primarily "occurred" there.

### A. Fifth Amendment Challenge

■ Defendants argue that the Jury Plan for the Eastern District of New York violates

the equal protection clause of the Fifth Amendment since the Plan chooses jurors for the Brooklyn Courthouse from all five Counties of the District, while those jurors for the Uniondale and Hauppauge Courthouses [3] are chosen only from Nassau and Suffolk Counties. Defendants argue that fewer minorities live in Nassau and Suffolk Counties than Brooklyn, Queens and Richmond Counties and therefore a jury pool emanating from only Nassau and Suffolk violates the equal protection clause of the Fifth Amendment.[4] In support of this, defendants have submitted statistics printed in *The New York Times*,[5] which, when added together by the defendants, indicate that Hispanics represent 14.-35% of the population of the total District, while only 6.33% of the population in Nassau and Suffolk, and that the Black population in the total District represents 20.99%, and only 7.43% of the Nassau and Suffolk populations.[6] *See* Def. Garces' Memorandum in Support, at 4 and Exh. D.

█ In order to establish a prima facie case for a violation of the Fifth Amendment, one must show (1) that the group involved is distinct or cognizable; (2) a substantial underrepresentation of the group when compared with the total population; and, (3) that the selection procedure employed is susceptible of abuse or not racially neutral. *Castaneda v. Partida,* 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977); *Alston v. Manson,* 791 F.2d 255, 257 (2d Cir.1986),

*cert. denied,* 479 U.S. 1084, 107 S.Ct. 1285, 94 L.Ed.2d 143 (1987). Once this prima facie case has been made, the presumption of discrimination can be rebutted by a legitimate government purpose. *Castaneda,* 430 U.S. at 497–498, 97 S.Ct. at 1282.

In asserting that the Plan for the Eastern District of New York violates this standard, defendants argue that an analogy be drawn between the New Haven, Connecticut jury plan at issue in *Alston v. Manson,* 791 F.2d 255 (2d Cir.1986), *cert. denied,* 479 U.S. 1084, 107 S.Ct. 1285, 94 L.Ed.2d 143 (1987), and the plan for the Long Island Division in the Eastern District of New York.

In *Alston,* the Second Circuit affirmed the District Court's finding that the jury pool plan for Connecticut State court violated the equal protection clause of the Fourteenth Amendment.[7] 791 F.2d at 259. That system provided that each county in the State compile a jury array and that each town within a county furnish a number of jurors. Section 51–220 of the Connecticut General Statute established a strict quota system wherein smaller towns within the county contributed more than larger towns. By way of example, the smallest town in New Haven County, Beacon Falls, contributed 4.2% of its population to the array, while New Haven, the largest town, contributed only 1.1% of its population to the array for the county. *Id.* at 256. In the context of a habeas corpus peti-

---

3. Together, the Uniondale and Hauppauge Courthouses are referred to as the "Long Island Division." While these two courthouses operate under the same Jury Plan, the present motion involves only the Uniondale Courthouse.

4. Note that the equal protection clause of the Fourteenth Amendment applies only to state proceedings and since "[t]he fifth amendment, which applies to the federal government, does not expressly guarantee equal protection of the laws ... when allegations of discrimination are raised against the federal government, the court must ask not whether the complainant has been deprived of equal protection of the laws but whether he or she has proven discrimination that is 'so unjustifiable as to be violative of due process.'" *See United States v. Biaggi,* 680 F.Supp. 641, 648 (S.D.N.Y.1988) *aff'd* 909 F.2d 662 (2d Cir.1990), *cert. denied,* 499 U.S. 904, 111 S.Ct. 1102, 113 L.Ed.2d 213 (1991) (citations omitted). Because "[t]he substantive standard to be applied in resolving discrimination claims against

the federal government appears to be identical to that used in deciding equal protection claims against the states," *id.,* this Court will use those standards that govern in equal protection cases for the analysis of the present matter. *See also Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954).

5. As stated in the article, these figures were released by Federal Immigration officials and the Census Bureau. *See* Def. Garces' Exh. D: *The New York Times,* February 22, 1991, at B1.

6. These final aggregations of the ethnic populations in question are solely the result of defendants' computations.

7. As stated in note 4, the analysis of an equal protection violation in the state system under the Fourteenth Amendment is the same as that of a violation in the Federal system under the Fifth Amendment.

tion, the convicted defendants argued that this scheme was unconstitutional since more Blacks tend to live in the more populated towns, and applying the three-pronged test of *Castaneda* as outlined above, the District Court agreed that this represented an equal protection violation.

The main issue on appeal in *Alston* was whether the second prong of the test had been satisfied, that is, whether the underrepresentation of Blacks was "substantial." In making this determination, the District Court employed the Statistical Decision Theory, which attempts to determine if chance alone could account for a particular result, in this case, the meager representation of Blacks in the jury array. The theory involves a comparison of the number of Blacks who were summoned under the town quota plan to the number which would be summoned without that system, and through various calculations, determines whether this difference is attributable to chance. If the discrepancy is wide, it is less likely to be due to chance. In *Alston*, it was found that 368 Blacks would be summoned under the quota system, and 501 would be summoned otherwise.[8] The odds of this happening by chance were three in one billion. *Id.* at 258. Due to this incredible likelihood, the Court ruled that the second prong of the test had been met, and the defendants made a prima facie case for an equal protection violation.

Defendants here argue that *Alston* mandates a similar finding in the present case. They argue that this case is an even stronger case for a constitutional violation since the plan in *Alston* only limited the representation of urbanites, while that of the Eastern District excludes them totally from the Long Island Courthouses. In support, they point to a quote from the Second Circuit that "[t]he ineluctable effect of the statutory scheme was to reduce the number of potential jurors drawn from large towns, especially New Haven, where it is undisputed that a larger proportion of blacks resided." Def.'s

Memo. in Support, at 6, quoting *Alston*, 791 F.2d at 257.

Defendants' analogy between the two cases is inherently faulty. The jury pool plan for the Eastern District of New York does not involve a town quota, nor does it limit in any way, the number of representatives summoned from a particular town as did the plan in Connecticut.

The Eastern District Plan is merely one which delineates a particular division within the District. The creation of such a division is clearly within the province of the District to facilitate the functions of the Court, and this practice, as utilized in federal districts across the country, has been repeatedly affirmed and condoned by the Supreme Court and various Circuit Courts of Appeal. *United States v. Gottfried*, 165 F.2d 360, 364 (2d Cir.) *cert. denied*, 333 U.S. 860, 68 S.Ct. 738, 92 L.Ed. 1139 (1948) (it is constitutional "to divide a district territorially in the interest of an impartial trial, of economy, and of lessening the burden of attendance."); *United States v. Titus*, 210 F.2d 210, 212–13 (2d Cir.1954); *United States v. Florence*, 456 F.2d 46, 49 (4th Cir.1972); *United States v. Test*, 550 F.2d 577, 594 (10th Cir.1976); *United States v. Herbert*, 698 F.2d 981, 984 (9th Cir.), *cert. denied*, 464 U.S. 821, 104 S.Ct. 87, 78 L.Ed.2d 95 (1983); *United States v. Yonkers Contracting, Inc.*, 682 F.Supp. 757, 768 (S.D.N.Y.1988) ("The Second Circuit repeatedly has rejected attempts to assert any constitutional prohibition or limitation on a court's powers rationally to administer or delineate jury divisions within districts." (citations omitted.)); *Savino v. County of Suffolk*, 774 F.Supp. 756, 759 (E.D.N.Y.1991). Additionally, the Jury Service and Selection Act which defendants claim have been violated, expressly provides for divisions within a judicial district. *See* 28 U.S.C. §§ 1861, 1863.[9]

---

8. This was the finding of the statistician who testified. *Alston*, 791 F.2d at 256, 258.

9. **28 U.S.C. § 1861. Declaration of policy**
    It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries

selected at random from a fair cross section of the community in the district *or division* wherein the court convenes. (emphasis added).

**28 U.S.C. § 1863. Plan for random jury selection** (a) ... Separate plans may be adopted for each division or combination of divisions within a judicial district....

■ The crux of defendants' argument is that they are entitled to a jury from the entire District rather than a division or part of the District. This "right" has been repeatedly denied by the Courts. Caselaw has uniformly rejected challenges to the right to delineate jury divisions within a district and it is a valid practice as long as not gerrymandered. *Ruthenberg v. United States*, 245 U.S. 480, 482, 38 S.Ct. 168, 169, 62 L.Ed. 414 (1918) (a jury drawn from only part of a district does not violate the Sixth Amendment); *Lewis v. United States*, 279 U.S. 63, 72, 49 S.Ct. 257, 260, 73 L.Ed. 615 (1929) (the Sixth Amendment and Judicial Code do not "require that the accused be tried by jurors drawn from the entire district."); *United States v. Gottfried*, 165 F.2d at 364 (divisions within a district need not be homogeneous and show an equal percentage of all possible groups. "There are probably no districts in the Union, which can be divided without disclosing in the sections different racial, religious, political, social or economic percentages. To demand that they shall not, would . be a fantastic pedantry which would serve no purpose and would put an end to the statute."); *United States v. Yonkers Contracting, Inc.*, 682 F.Supp. at 768 ("There is no constitutional right to have a jury from an entire district.... Juries may be selected exclusively from certain geographic areas, such as the division or counties located nearest the courthouse."); *United States v. Test*, 550 F.2d at 594 ("the partitioning of a district into jury divisions is sanctioned by the statute [28 U.S.C. § 1863(a) and 1869(c) ], and it is clearly not unconstitutional, absent evidence that some cognizable group has been systematically excluded by 'gerrymandering' the division lines."); *Zicarelli v. Dietz*, 633 F.2d 312, 317 (3d Cir.1980), *cert. denied*, 449 U.S. 1083, 101 S.Ct. 868, 66 L.Ed.2d 807 (1981) ("We begin with the well-established principle that a defendant does not have a right under the Sixth Amendment to have jurors drawn from the entire district."); *United States v. Florence*, 456 F.2d at 49 ("the validity of a selection [of a jury] less encompassing than district-wide was repeatedly upheld against attacks that a defendant was entitled to a jury selected from the entire district and not from just the division or area surrounding the place of trial where trial was held."); *United States v. Herbert*, 698 F.2d at 984 (it is constitutional to draw a petit jury from only one division rather than the whole district).

The Long Island Division of the Eastern District of New York was not gerrymandered, but created out of practicability. The fact that the Uniondale and Hauppauge Courthouses are not accessible by public transportation is why jurors from the other Counties are not compelled to serve on those juries, not because of race concerns. It is next to impossible for someone who lives in Staten Island without a car to commute to either Uniondale or Hauppauge for jury service, and imposing such a requirement would. constitute an undue burden and financial hardship on those particular citizens. Some jurors would suffer particular financial hardship since they are not immediately reimbursed for their travel costs or per diem wage and many do not have the wherewithal to advance substantial sums of money for this purpose. Propelled by these practical concerns, the Long Island Division was created in 1985.

In addition to defendants' faulty reliance on and analogy to the circumstances in *Alston*, they have failed to indicate how this case satisfies the *Castaneda* test to prove a Fifth Amendment violation. While Blacks and Hispanics repeatedly have been deemed "distinct," as required by the first prong, (*see Castaneda*, 430 U.S. at 494–495, 97 S.Ct. at 1280: Mexican–Americans are a clearly cognizable group; *Alston*, 791 F.2d at 257: Blacks are a distinct group), defendants have failed to establish or explain the existence of a "substantial underrepresentation" of the minority groups at issue. *See infra*, text at 858–860. Defendants have also failed to meet the requirement of the third prong, having provided absolutely no evidence that the procedure employed is "susceptible to abuse or not racially neutral." *See United States v. Biaggi*, 909 F.2d 662, 677 (2d Cir. 1990), *cert. denied*, 499 U.S. 904, 111 S.Ct. 1102, 113 L.Ed.2d 213 (1991) (failure to show that use of voter registration lists as sole source of prospective jurors was not racially neutral or susceptible to abuse proved fatal

to Fifth Amendment claim.) As a result, defendants have failed to make a prima facie case that the Jury Plan for the Eastern District of New York violates the Fifth Amendment.

The Long Island Division was created for legitimate and practical reasons, and the method of summoning jurors for the Long Island Courthouses from only Nassau and Suffolk Counties is a function of the reality concerns of public transportation on Long Island, not racial gerrymandering. Despite defendants' desperate attempt to analogize this case with *Alston*, the differences in the Plans and the circumstances vary to such a degree as to definitively defeat the analogy, and defendants have not made a prima facie case pursuant to the *Castaneda* test. The Jury Plan for the Eastern District of New York does not violate the Fifth Amendment of the Constitution.

## B. Sixth Amendment Challenge

■■■ The Sixth Amendment mandates that a jury be a fair cross section of the community in which the crime was committed.[10] In order to sustain a challenge that a jury plan is violative of this Amendment, the Supreme Court has stated that the party must show that (1) the excluded group is distinctive; (2) representation of this group in the venire is not fair and reasonable in relation to the population in the community; and (3) the underrepresentation is due to a systematic exclusion in the process.[11] *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664,

668, 58 L.Ed.2d 579 (1979). *United States v. LaChance*, 788 F.2d 856, 864 (2d Cir.1986), *cert. denied*, 479 U.S. 883, 107 S.Ct. 271, 93 L.Ed.2d 248 (1986). In applying this test to the case at bar, it is clear that defendants have failed to make a prima facie case.

As stated above, Courts have repeatedly indicated that Blacks and Hispanics are "distinct" groups for the purpose of this analysis. *Castaneda*, 430 U.S. at 504, 97 S.Ct. at 1280 (Mexican–Americans are distinct group); *Alston*, 791 F.2d at 257 (Blacks are distinct). Having met this, defendants argument nevertheless falters in the analysis of the second and third prongs of the test.

To establish satisfaction of the second prong, defendants look to *United States v. Osorio*, 801 F.Supp. 966 (D.Conn.1992) wherein the District Court used the "absolute numbers" approach to determine if the representation of the minority group in question was unfair and unreasonable.[12] Through a two-step process, this method examines the numbers actually represented and determines how many more of that group would be needed to make a representation proportionate to the community. Firstly, it is necessary to calculate the difference between the groups' representation in the population and the representation in the jury venire. This percentage difference is then multiplied by the number of people on a typical venire to determine how many more people would be needed to make the venire truly represen-

---

**10.** The Sixth Amendment states:

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

**11.** Note that this standard is quite similar to that for the Fifth Amendment. *United States v. La-Chance*, 788 F.2d 856 at 864 (court declines to distinguish between a Fifth Amendment and Sixth Amendment claim). While both seek to eliminate discrimination, the Fifth Amendment ensures that a particular race receive equal protection under the law, and therefore standing of the defendant is an issue. *Castaneda*, 430 U.S. at

504, 97 S.Ct. at 1280; *United States v. Biaggi*, 680 F.Supp. at 649–651. On the other hand, the Sixth Amendment seeks to ensure that every defendant, no matter what their particular race or ethnicity, receives a jury which is representative of the community. For this reason, standing is not a requirement under the Sixth Amendment. *Taylor v. Louisiana*, 419 U.S. 522, 526, 95 S.Ct. 692, 695, 42 L.Ed.2d 690 (1975). In the present case, this issue is moot since the defendants are representatives of the races which they allege are underrepresented in the Long Island Division Jury Plan.

**12.** This method has been sanctioned by the Second Circuit. *United States v. Jenkins*, 496 F.2d 57, 65 (2d Cir.1974), *cert. denied*, 420 U.S. 925, 95 S.Ct. 1119, 43 L.Ed.2d 394 (1975); *United States v. Biaggi*, 909 F.2d at 678; *United States v. Maldonado–Rivera*, 922 F.2d 934, 970 (2d Cir. 1990), *cert. denied*, 501 U.S. 1211, 111 S.Ct. 2811, 115 L.Ed.2d 984 (1991).

tative of the community. *Osorio*, 801 F.Supp. at 977; *United States v. Biaggi*, 680 F.Supp. at 655.

In order for this calculation to be useful, it is necessary that the initial figure of the group's representation in the community be an effective benchmark, to wit: it is a number that is truly representative of the numbers of the group that are eligible for jury service.[13] *Osorio*, 801 F.Supp. at 977; *Duren*, 439 U.S. at 364–365, 99 S.Ct. at 668–669; *LaChance*, 788 F.2d at 865.

In *Osorio*, at issue was another Connecticut jury plan. There, the plan operated in such a way that each town provided the clerk with the names of 10% of its population for the Master Jury Wheel. The crux of the case was that there were no residents of either New Britain or Hartford in the Master Jury Wheel for the Hartford Division of the District, and as communities with heavier minority populations, their absence from the pool created an imbalance.[14]

In applying the "asbolute numbers" method, the *Osorio* Court determined that the voting age of the population would serve as the benchmark.[15] Blacks represented 6.48% of the voting age population in the district, while only 3.08% of the Master Jury Wheel. This difference, 3.26%, multiplied by fifty, the number of persons in a typical venire, indicated that two more Blacks would have to be added to a typical venire for that venire to be representative of the population.[16]

Defendants here argue that applying the "absolute numbers" test to the figures in the Eastern District of New York indicates that there is a need for seven additional Blacks and four additional Hispanics to make the Long Island Division jury pool proportionate to the population of the District at large, and that this is a substantial underrepresentation and not "fair and reasonable." They reach this conclusion by comparing the Black population in the total district with that of Nassau and Suffolk Counties (21% − 7%) and multiplying this difference (14%) by fifty, the size of a typical venire, to arrive at seven. The same calculations were performed regarding the Hispanic population, with the conclusion that four additional persons were needed.[17] Defendants argue that since the addition of two members was deemed unacceptable in *Osorio*, than surely the seven- and four-person differential here reflects a "substantial underrepresentation."

While an admirable attempt, defendants' calculations rest on a faulty premise. As indicated above, a key consideration necessary to give the "absolute numbers" method credibility is that the benchmark population be accurate. Here, defendants' benchmark population is the entire number of Blacks and Hispanics in the District. As stated in *Osorio*, "[i]deally, the benchmark is the percentage of the community that is eligible for jury service." *Osorio*, at 977, quoting *LaChance*, 788 F.2d at 865 ("first step is to determine 'how many members of the allegedly underrepresented group would be ex-

**13.** According to 28 U.S.C. § 1865, any person is eligible for jury service, unless he (1) is not a United States citizen who is eighteen years old and residing in the district for a period of one year; (2) is unable to read, write or understand the English language; (3) is unable to speak the English language; (4) is incapable, due to mental or physical infirmity, of rendering satisfactory service; or (5) has a charge pending against him in either State or Federal court for a crime punishable for more than one year of imprisonment. 28 U.S.C. § 1865(b)(1)–(5).

**14.** There was testimony that the names of the New Britain residents were never entered into the computer from which the Master Jury List was drawn, but no explanation was given for the absence of Hartford residents in the Master Jury Wheel. The District Court noted that considering that Hartford was the largest town in the

Division, its absence could not be due to randomness. *Osorio*, 801 F.Supp. at 972–973.

**15.** While the District Court recognized that the voting age population was not a perfect benchmark since many voters may not be eligible for jury service, it found that there was no "better estimate" and accepted it as the benchmark. *Osorio*, 801 F.Supp. at 977–978.

**16.** Additionally, the representation of Hispanics in the voting age population is 5.07%, but there were only 0.77% in the Master Jury Wheel. This difference indicates that two more Hispanics would need to be added to a venire to make it proportionate to the community. *See Osorio*, at 978.

**17.** Blacks: $(21\% - 7\%) \times 50 = 7$.
Hispanics: $(14\% - 6\%) \times 50 = 4$.

pected to appear on the jury panel in order to reflect the percentage of the group in the total population *eligible for jury service.'*") (emphasis added).

Not every person who lives within a judicial district is eligible for jury service.[18] The figures provided by defendants fail to account for this subgroup, and by submitting numbers which reflect the total number of the group in question, rather than the numbers of that group who are eligible to serve, defendants dramatically increase the proportion of minorities in the community from which the comparison is drawn. As a result, defendants have failed to show that the proportion of Blacks and Hispanics in a typical venire is unfair and unreasonable, as required by the *Duren* test.

■ Even were defendants able to show this, they fail to meet the third prong of the analysis. This examines whether the underrepresentation is due to a "systematic exclusion." In *Osorio,* the Court found that the blatant absence of residents from two of the largest towns in the District, which together represented two-thirds of the minority population in the district, amounted to "systematic exclusion." *Osorio,* at 979. The *Alston* Court found "systematic exclusion" since "the statute [Connecticut General Statute § 51–220] operate[d] directly to exclude Blacks from the jury array." *Alston,* 621 F.Supp. 992, 996 (D.C.Conn.1985). Other examples include the findings in *Taylor v. Louisiana,* 419 U.S. at 523, 525, 95 S.Ct. at 694, 695 (women were systematically excluded since they had to file a written declaration of their desire to be subject to jury service before they could be selected); and *Thiel v. Southern Pacific Co.,* 328 U.S. 217, 221–224, 66 S.Ct. 984, 986–987, 90 L.Ed. 1181 (1946) (systematic exclusion occurred since the Clerk of the Court and the Jury Commissioner testified that they deliberately eliminated all persons earning a daily wage from the

jury pool). Yet, statistical disparity does not rise to "systematic exclusion." *United States v. Test,* 550 F.2d 577, 587 (10th Cir.1976).

In the present case, there is no "systematic exclusion." In the Eastern District of New York, voter registration lists, supplemented with lists from the Department of Motor Vehicles, provide the sources for jury names. From these, names from each County are randomly selected in numbers proportionate to the total number of source list names in the District to constitute the Master Jury Wheel for the entire District, and names from Nassau and Suffolk Counties are drawn in a manner proportionate to the total names in the Long Island Division to constitute that Master Jury Wheel. The names on these lists receive forms to complete to determine their qualifications for jury service. *See* Def. Garces' Exh. B: "Jury Selection Plan—Eastern District," §§ 4–6.

This Plan does not evince deliberate exclusion of any particular group as occurred in the cases cited above. Indeed, as stated earlier, the purpose of creating the Long Island Division was to accommodate the transportation problems of citizens of the District who live in Counties that are unaccessible to either the Uniondale or Hauppauge Courthouses by public transportation. The Plan does not operate to limit or systematically exclude the participation of minority populations in the District and defendants have failed to show otherwise. As a result, defendants have failed to make a prima facie case that the Jury Plan for the Eastern District of New York violates the Sixth Amendment.

**C. Jury Selection and Service Act**

■ This statute requires that each Federal jury plan be effected so that a jury be a fair cross section of the community and that no citizen be prohibited from jury service due to discrimination.[19] Without elaboration, de-

---

18. *See* 28 U.S.C. § 1865; note 13 for requirements.

19. 28 U.S.C. § 1861 states:
It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes. It is further the policy of the United States that all citizens shall have the opportunity to be considered for service on grand and petit juries in the district courts of the United States, and shall have an obligation to serve as jurors when summoned for that purpose.

fendants argue that the Plan violates this statute since it creates a division which is not representative of the whole population of the District.

The Second Circuit has held that although not completely synonymous, the mandates of this statute are parallel to those of the Sixth Amendment. "The Second Circuit's opinions interpreting the Jury Act closely resemble the sixth amendment cases discussed above." *Biaggi,* 680 F.Supp. at 655, 655–657, *aff'd* 909 F.2d 662 (2d Cir.1990); *see LaChance,* 788 F.2d at 864; *United States v. Test,* 550 F.2d at 584; *United States v. Gerena,* 677 F.Supp. 1266, 1272 (D.Conn.1987). *See also Taylor,* 419 U.S. at 528, 95 S.Ct. at 697 (the Jury Selection and Service Act has a "similar thrust" to the Sixth Amendment). "The court's finding for sixth amendment purposes that the underrepresentation demonstrated here is legally insignificant holds as well for the Jury Act claim." *Biaggi,* 680 F.Supp. at 657. So too is the case here.

### 2. Guidelines for the Eastern District

■ Defendants' second argument is that this case has been inappropriately designated a "Long Island case" and therefore should be transferred to Brooklyn. Initially, the Court takes this opportunity to explain the purpose and parameters of the Court's administrative rules. Defendants mistakenly assert that these local administrative rules *entitle* them to make arguments regarding the assignment of cases, yet this "entitlement" is explicitly rejected by the rules themselves. Titled "Guidelines for the Division of Business, United States District Court, Eastern District of New York, Adopted Pursuant to 28 U.S.C. § 137," the heading then states:

> These rules are adopted for the internal management of the case load of the court and shall not be deemed to vest any rights in litigants or their attorneys and shall be subject to such amendments from time to time as shall be approved by the court.

While 50.2(f) permits that "[a]ny objection by a party to designation of a judge or to a place of trial shall be made by letter or motion to the judge assigned . . . ," this Court reiterates that these rules are *not* intended to give the parties a right to litigate where a particular case will be tried, but merely provide the guidelines by which the Eastern

District administratively handles and assigns its cases.

Again, as stated above, the Court emphasizes the absence of any right in litigants to use these rules to challenge how the District chooses to assign its cases and the Court affirms the designation of this case as one for the Uniondale Courthouse. As stated in 50.-1(d)(1), "a criminal case shall be designated a 'Long Island case' if the crime was allegedly committed wholly or in substantial part in Nassau or Suffolk County." The crimes alleged in this case have allegedly been committed in Nassau and Suffolk, which substantiates the assignment of the case to the Long Island Courthouse.

The connections to Nassau and Suffolk are that defendant Eugenio Melo lived on Long Island throughout the time period in question and allegedly used his home telephone to conduct affairs of the conspiracy, and that defendant Alvaro Garces lived in Nassau County for a period of time when he participated in the conspiracy. Defendant Garces disputes that he ever lived in Malverne, and asserts that he always lived in Queens during the period set forth in the Indictment. Nevertheless, the Government also alleges that the evidence will show that various Long Island locations were used to conduct the affairs of the organization and that defendant Melo met with customers on Long Island.

As the rules themselves state, a case is designated as a "Long Island case" if the crime was allegedly committed in whole or in part in Nassau or Suffolk County. While some of the concrete details such as registration of vehicles rests in Queens and Brooklyn, the Government also alleges that the organization or conspiracy was controlled from Long Island and that many of the transactions and sales took place on Long Island. In fact, the Complaint in the case was drafted by a Task Force Officer assigned to the Long Island Drug Enforcement Task Force. That his investigation led to the various warrants in this case is further evidence that this case involves crimes "committed in Nassau and Suffolk" and that this has been properly designated as a "Long Island case."

As a result, this Court finds that the connections between this case and Nassau and Suffolk Counties represent a valid and appro-

priate justification for maintaining this case at the Uniondale Courthouse. As this case progresses towards trial, it may be determined that it would be more convenient for all parties involved, including this Court, that this case be tried in a Brooklyn courtroom and the Court reserves the right to make this determination should it become appropriate at a later date. Nevertheless, at this juncture, defendants' motion to transfer to Brooklyn and/or request for a jury pool from the Master List of the Eastern District of New York is hereby denied.[20]

SO ORDERED.

---

20. Defendant Garces requests for the first time in his reply papers, a "hearing, including the testimony of the Jury Administrator, and access to jury selection records and materials." *See* Def. Garces' Reply Memo, at 24. To be entitled to testimony of the jury commission and "any relevant records and papers not public or otherwise available," 28 U.S.C. § 1867(d), the section cited by defendants, requires the submission of a "sworn statement of facts, which, if true, would constitute a substantial failure to comply with the provisions of this title." Defense counsel's affidavit does not provide the necessary facts, and therefore defendant is not entitled to such a hearing. "[LaChance] was not entitled to a hearing to explain why he did not make out a prima facie case." *LaChance,* 788 F.2d at 869. Therefore, defendants' request for a hearing is denied.

Additionally, this section, 28 U.S.C. § 1867, permits a motion for a stay or dismissal of the indictment, neither of which is properly raised by defendants, and requires that such be made within ten days of when defendant did or could have discovered any failure to comply with this title. Defendants have failed to respect these procedures and therefore this "motion" is improper and untimely.